Charles D. **EATMAN**, Plaintiff,

v.

**UNITED PARCEL SERVICE,**
Defendant.

**No. 99 Civ. 9523.**

United States District Court,
S.D. New York.

March 31, 2002.

---

*OPINION & ORDER*

STEIN, District Judge.

Charles D. Eatman brings this employment discrimination action against United Parcel Service ("UPS") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). UPS now moves pursuant to Fed.R.Civ.P. 56 for summary judgment in its favor on the ground that there is no genuine issue of material fact that could enable a reasonable jury to conclude that UPS discriminated against Eatman, a former UPS package car driver, because of his race, his religion, or in retaliation for his having complained to UPS about racial and religious discrimination. For the reasons set forth below, UPS's motion is granted and Eatman's complaint is dismissed.

*BACKGROUND*

I. *Eatman's Decision to Wear Locked Hair*

African locked hair is a hairstyle in which sections of hair are hand-rolled together in tight, interwoven spirals. (Evans Aff. ¶ 2; Evans Dep. at 99–100; Eatman Dep. at 26.) The resulting locks, commonly known as "dreadlocks," cannot be combed out. (Evans Aff. ¶ 2.) According to expert testimony offered by plain-

tiff, "in general," only persons of African descent, whose hair is naturally "coiled," can properly maintain locks. (Evans Aff. ¶ 2.) However, according to the same expert, locked hair is "universal" and "has appeared and thrived [or at least been "imitated" or "emulated"] throughout the world in Africa, India, Asia, the Pacific Islands, Greece, Ethiopia (Abyssinia) and Nazareth." (Evans Dep. at 86–89.)

After putting "a lot of thought" into the decision, Eatman, who is black, began wearing locks in February 1995 as "an outward expression of an internal commitment to [his] Protestant faith as well as [his] Nubian belief system." (Eatman Aff. ¶¶ 2, 4–5.) According to Eatman, "[c]ountless religious texts and the Bible have taught [him] about the strength and divinity of locks." (Eatman Aff. ¶ 3; Eatman Dep. at 27.) Moreover, because he interprets "several passages of the Bible to mean that hair is divine and that Jesus wore his wooly hair in locks," wearing locks is a way for him to emulate Jesus. (Eatman Aff. ¶ 3; Eatman Dep. at 27–28, 49.) At the same time, through his Nubian beliefs and "knowing more about [his] ancestry," Eatman had come to be "enlightened" about locked hair: "the strength behind locks," "the spiritual instance of it," and its connection to African identity and heritage. (Eatman Dep. at 29–30; Eatman Aff. ¶¶ 2–5; Evans Dep. at 76.)

Although other members of Eatman's Protestant congregation wear locks, Eatman's locked hair is, as he himself describes it, a "personal choice," and "not a mandate" of his religion. (Eatman Dep. at 32–33; Eatman Aff. ¶ 3.)

Given the importance of locks to Eatman, he believes that wearing a hat over them suppresses who he is and covers up something which to him is "beautiful" and "which is part of how [he] project[s] [him-]self." (Eatman Dep. at 45–46.) Howev-er, Eatman's Protestant faith does not frown on hats, (Eatman Dep. at 49–50), and Nubianism, though in part a celebration of hair, does not mandate an uncovered head or punish a covered one, (Evans Dep. at 83–84).

## II. *The UPS Appearance Guidelines and Hat Accommodation*

UPS maintains appearance guidelines for drivers. (Schultz Decl. ¶ 4.) Pursuant to a collective bargaining agreement between UPS and the driver's union, the drivers must comply with the guidelines which provide that, for male drivers, "[h]air styles should be worn in a business-like manner." (Schultz Decl. Exs. A & B.)

In the metropolitan New York area, UPS labor relations manager Thomas Schultz is responsible for interpreting and enforcing the guidelines. (Schultz Decl. ¶ 9.) In this case, he did so in conjunction with Juan Vicente, the manager of the UPS center located on 43rd Street, and James Surace, Eatman's direct supervisor. (Scultz Decl. ¶¶ 10–15.) Schultz uses his "common sense" to determine which hairstyles are not "businesslike." (Schultz Dep. at 22.) He finds ponytails, mohawks, green hair, "carved" shapes, and locked hair—either short or long—unacceptable. (Schultz Dep. at 22, 29; 48–49.) Since he became labor relations manager in 1995, Schultz has accommodated drivers with "unbusinesslike" hairstyles by permitting them to retain their hairstyles as long as they cover them with a hat while driving. (Schultz Decl. ¶ 9; Vicente Dep. 69–70.)

As of January 1999, eighteen UPS drivers in the metropolitan New York area were required to wear hats in order to cover their "unconventional" hairstyles, which included "dreadlocks," "braids," "corn rolls," a " 'dew rag,' " and a "pony-tail." All but one were African–Americans. (Erving Aff. Ex. G.)

### III. The Conflict Between Eatman's Locks and the UPS Hat Policy

Eatman, who started working for UPS as a package car driver in 1989, did not begin wearing locks until 1995. (Eatman Dep. at 20, 28.) In the summer of 1996, Vicente and Surace informed him that UPS's appearance guidelines now required all employees with locked hair, including him, to wear a hat. (Eatman Aff. ¶ 9; Eatman Dep. 36–38; Schultz Decl. ¶¶ 10–11.) At first, UPS told Eatman that he could wear either a cold-weather "woolen skully," a sun-visor, or a mesh or canvas baseball cap. (Eatman Dep. 37–39; Eatman Aff. ¶¶ 16–17.) The sun visor, however, "wasn't acceptable" to Vicente. (Eatman Dep. at 38–39; Eatman Aff. ¶ 17.) Moreover, the baseball caps were "too small" because Eatman's hair hung outside of them, and that was also unacceptable to UPS. (Eatman Dep. at 39–40; Eatman Aff. ¶ 17.) Eatman was further told that he could not wear his own brown, light cotton hat. (Eatman Dep. at 41; Eatman Aff. ¶ 17.) Eatman felt he had no choice but to wear the wool hat. (Eatman Dep. at 39; Eatman Aff. ¶ 17.)

Eatman told Vicente that he thought the hat policy was "discriminatory." (Eatman Aff. ¶ 16, Ex. B at 9–10.) Nevertheless, he did wear the wool hat "for a time." (Eatman Dep. at 38; Eatman Aff. ¶ 16.) According to Eatman, however, the "wool hat was too hot to wear[,] especially in summer and warm weather." (Eatman Aff. ¶ 17, Ex. B at 16.) As he told UPS management, wearing it made him "feel faint" and gave him headaches. (Eatman Aff. ¶ 17, Ex. B at 12, 14–17.) Moreover, as he explained at his deposition, it "destroyed" at least ten of his locks. (Eatman Dep. at 41; Eatman Aff. ¶ 17.) Nekhena Evans, Eatman's expert "locktician," explains that "wearing a thick wool ski hat smothers locked hair, causing the hair to become over-heated and moist." (Evans Aff. ¶ 3.)

This causes two problems. First, "the locks become more susceptible to fragmentation, weakness, splitting, matting, and breakage;" second, "the prolonged exposure of a thick wool ski hat on locked hair causes dandruff, louse, bacteria, mold and other fungi to breed and thrive within the locks and on the scalp." (Evans Aff. ¶ 3.)

Some months later, Eatman's supervisors asserted that he was not complying with the hat policy. (Eatman Aff. Ex. B.) Vicente and other supervisors met with Eatman and union representatives on four separate occasions in February and March of 1997 to discuss the situation. At the final meeting, on March 21, Vicente told Eatman that he had to wear a wool hat while on the job. (Clark Decl. Ex. C; Eatman Aff. ¶ 10, Ex. B at 14.)

After that, Eatman wore the hat "a fair amount of time" until he went on disability leave in April 1997. (Eatman Dep. at 42.) When he returned to work in September 1997, however, he did not "wear the hat that often." (Eatman Dep. at 43–45.) He told UPS in November that "stress" was causing his hair to break off. (Eatman Aff. Ex. B at 17.)

The record does not reflect exactly what happened from then until May 1998. Events came to a boil, however, on May 18, 1998, when Vicente, after consulting with Schultz, told Eatman that he would be suspended if he continued to refuse to wear the hat. (Eatman Dep. at 53; Vicente Dep. at 184; Schultz Decl. ¶ 12.) Eatman refused, and Vicente suspended him. (Eatman Dep. at 53–54; Vicente Dep. at 184–185.) Schultz and Vicente next met with Eatman and union representatives on June 3, 1998, at which point Eatman again refused to wear the hat to cover his locks. (Schultz Decl. ¶ 15; Vicente Dep. at 190; Eatman Dep. at 55–56.) Schultz then fired him. (Schultz Decl. ¶ 15; Eatman Dep. at 56.)

The union filed a grievance contending that Eatman's termination violated the collective bargaining agreement between UPS and the union. (Schultz Decl. ¶ 17.) On January 11, 1999, an arbitrator upheld UPS's decision, finding that UPS's appearance guidelines were "reasonable as applied" to Eatman and that Eatman's "repeated refusal to comply" with those standards constituted "gross insubordination, justifying his discharge." (Schultz Decl. Ex. C at 10.)

## IV. *Incidents of Harassment*

Eatman alleges that once he began to grow locks in 1995 he was repeatedly harassed by UPS managers. (Eatman Aff. ¶ 7.) In February 1995, manager Joe Green told him he looked like someone from the science fiction television series "Alien Nation." (Eatman Aff. ¶ 8.) In early 1996, manager Bobby Rosa allegedly asked Eatman, "What's that shit on your head?" (Eatman Aff. ¶ 8.) Around the same time, manager Joe Manicalco looked at Eatman's locks and said, "Someone give me a pair of scissors." (Eatman Aff. ¶ 8.) Manicalco also told Eatman that if he were Eatman's direct manager, Eatman "wouldn't be working." (Eatman Aff. ¶ 8.)

On January 30, 1997, roughly six months after Vicente and Surace first informed Eatman that he had to wear a hat, manager Steve Luchie looked at Eatman's hair and told him to "leave the extracurricular drugs alone." (Eatman Aff. ¶ 10.) On February 24, 1997, about a month before Vicente told Eatman that he had to wear a wool hat whenever he was on the clock, Surace told Eatman that he looked like Stevie Wonder. (Eatman Aff. ¶ 10.)

The next incident of alleged harassment took place on August 4, 1997, during the period of Eatman's disability, when manager Marc O'Callahan wondered out loud in Eatman's presence whether Eatman "was absent from work due to 'all that shit on [his] head.'" (Eatman Aff. ¶ 10.) Joe Green allegedly pulled Eatman's hair on January 28, 1998. (Eatman Aff. ¶ 11.) Finally, on March 17, 1998, about two months before Vicente suspended Eatman, Eatman arrived at work and noticed that in the area on his UPS truck where the driver's name plate was supposed to be there was a plate that read "ASSWIPE." (Eatman Aff. ¶ 12, Ex. C.) According to Eatman, this name plate "was a replica in size, shape and color of the standard name plate used to commend UPS drivers." (Eatman Aff. ¶ 12.) He believes that this incident demonstrates "that UPS management equated [his] hair with toilet paper." (Eatman Aff. ¶ 12.)

## DISCUSSION

UPS moves for summary judgment in its favor dismissing the complaint. Summary judgment will be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)). In determining whether a genuine dispute remains as to a material fact, the court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because there is no genuine issue of material fact precluding judgment as a matter of law with respect to any of Eatman's racial, religious, and retaliatory discrimination claims, the Court grants summary judgment in favor of UPS.

## I. *Racial Discrimination Claims*

Eatman alleges that UPS required him to wear a wool hat, suspended him, terminated him, and subjected him to a hostile

work environment because he is black, all in violation of Title VII. His theories are that (1) UPS maintains a facially discriminatory grooming policy, (2) he has presented "direct" evidence of intentional discrimination, (3) he has presented "indirect" evidence of intentional discrimination, and (4) UPS maintains a grooming policy that has an unlawfully disparate impact on African–Americans.

### A. Facially Discriminatory Policy

■ Eatman contends that UPS's appearance guidelines are facially discriminatory because they single out African–Americans on the basis of a characteristic—locked hair—that is unique to African–Americans. *See International Union, United Auto. Workers v. Johnson Controls, Inc.,* 499 U.S. 187, 197–98, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (policy based on capacity of female employees to become pregnant was facially discriminatory); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Even assuming that UPS's hat policy applies exclusively to locked hair and not all "unbusinesslike" hair, this argument fails. According to Eatman's own expert, African–Americans are not the only persons who lock their hair (Evans Dep. at 86–89), and there is no evidence that UPS differentiates, as Eatman's expert does, between "black" locked hair and what she refers to as "imitation" locked hair. Finally, it is beyond cavil that Title VII does not prohibit discrimination on the basis of locked hair. *See Rogers v. American Airlines, Inc.,* 527 F.Supp. 229, 232 (S.D.N.Y.1981) ("An all-braided hair style is an 'easily changed characteristic,' and, even if socioculturally associated with a particular race or nationality, is not an impermissible basis for distinctions in the application of employment practices by an employer.") (citing *Garcia v. Gloor,* 618 F.2d 264, 269 (5th Cir.1980)); *Carswell v. Peachford Hosp.,* No. C80–22A, 1981 WL

224, at *2 (N.D.Ga. May 26, 1981); *Wofford v. Safeway Stores, Inc.,* 78 F.R.D. 460, 469 (N.D.Cal.1978). Thus, even if UPS's policy explicitly discriminated against locked hair, it would not violate Title VII on its face.

### B. Direct Evidence of Intentional Racial Discrimination

Eatman asserts that he has presented "direct evidence" of discrimination. Although Eatman does not cite it, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), enables a Title VII plaintiff, through what has sometimes been described as "direct evidence," *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989); *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring), but is more accurately described as "circumstantial evidence . . . tied directly to the alleged discriminatory animus," *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992) (citing *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1185 (2d Cir.1992)), to show that "an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision," *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 23 (2d Cir.1996) (quoting *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775), and thereby shift the burden of proof to the employer "to prove by a preponderance of the evidence that it would have made the same decision" regardless of its consideration of the impermissible criterion, *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997). Evidence warranting a *Price Waterhouse* burden shift includes "policy documents and evidence of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged discriminatory attitude." *Id.* at 60–61 (quotation omitted) (emphasis in original). Eatman has produced no such

" 'smoking gun' " or " 'thick cloud of smoke' " indicating that he was fired because of his race. *Id.* at 61. He is therefore not entitled to a *Price Waterhouse* burden shift.

## C. Indirect Evidence of Intentional Racial Discrimination

Of course, a Title VII plaintiff's boat is not automatically sunk by his inability to obtain "direct" evidence of discrimination. "The shifting burdens of proof set forth in [*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),] are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.' " *Thurston,* 469 U.S. at 121, 105 S.Ct. 613 (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979)); *Price Waterhouse,* 490 U.S. at 271, 109 S.Ct. 1775 (O'Connor, J., concurring).

Pursuant to the *McDonnell Douglas* framework, a plaintiff must first establish "a prima facie case of racial discrimination." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. A plaintiff meets this burden, which is "not onerous," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), by showing through direct or circumstantial evidence, that (1) he was within a protected group; (2) he was qualified for the position; (3) he suffered an adverse employment action, and (4) the action " 'occurred under circumstances giving rise to an inference of discrimination.' " *Windham v. Time Warner, Inc.,* 275 F.3d 179, 187 (2d Cir.2001) (quoting *Burger v. New York Inst. of Tech.,* 94 F.3d 830, 833 (2d Cir.1996)).

An employer may not remain silent in the face of a prima facie case. *See Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. To avoid defeat, the employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* "This burden is one of production, not persuasion," *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), and simply requires the defendant to produce admissible evidence showing "reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action," *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original).

If the defendant succeeds in meeting its burden, the presumption of discrimination created by the plaintiff's prima facie case "simply drops out of the picture," *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742, and the plaintiff is left with the task of showing that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Because the "ultimate burden" of demonstrating intentional discrimination resides with the plaintiff, *id.; Hicks,* 509 U.S. at 507, 113 S.Ct. 2742, "the employer will be entitled to summary judgment … unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination," *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). The "governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *Id.* at 156 (citing *Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097); *see also Lizardo v. Denny's, Inc.,* 270 F.3d 94, 103 (2d Cir. 2001); *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 382 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 93–94 (2d Cir.2001); *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000). Factors to be considered " 'include the strength of the plaintiff's prima

facie case, the probative value of the proof that the employer's explanation [for the adverse employment action] is false, and any other evidence that supports [or undermines] the employer's case.'" *James*, 233 F.3d at 156 (quoting *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097).

With respect to Eatman's prima facie case, there is no dispute that he was qualified for his position as a driver, and the Court will assume for purposes of this motion that he was fired under circumstances giving rise to an inference of racial discrimination. UPS, however, has come forward with evidence sufficient for a jury to conclude that UPS terminated Eatman because of his refusal to comply with the company's appearance guidelines. (Schultz Decl. ¶ 15.) That is certainly a "legitimate, nondiscriminatory reason" for that adverse employment action. Indeed, the maintenance of reasonable grooming requirements for employees who deal with customers is "an aspect of managerial responsibility." *Fagan v. National Cash Register Co.*, 481 F.2d 1115, 1125 (D.C.Cir. 1973). Thus, the *McDonnell Douglas* presumption of discrimination simply drops out of this case, and the Court must grant summary judgment in UPS's favor unless Eatman has submitted evidence that "reasonably supports a finding of prohibited discrimination." *James*, 233 F.3d at 154.

In his efforts to raise such an inference, Eatman has not identified any specific similarly situated non-black employee who was not disciplined for violating the hair appearance guideline. (Eatman Dep. at 60–61.) Rather, Eatman points to evidence that seventeen out of the eighteen UPS employees subject to the hat policy in the New York metropolitan area are black. (Erving Aff. Ex. G.) This statistic appears to coincide with Eatman's allegation that locked hair—worn by eleven of the seventeen—is a "definitively African–American hairstyle," (Pl.'s Opp. at 11), and with the

assumption that braided hair—worn by four of the seventeen—is closely associated with African–Americans, *see Rogers*, 527 F.Supp. at 231–32. It is not impossible to imagine a situation in which a frivolous appearance guideline so disparately impacts a protected class that a jury could infer from the existence of that situation alone that the employer adopted the guideline as a "subterfuge for discrimination." *Carswell*, 1981 WL 224, at *2; *Rogers*, 527 F.Supp. at 232; *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999). Such a situation could theoretically occur even where, as here, the guideline turns on a "mutable" characteristic such as hairstyle. *See Carswell*, 1981 WL 224, at *2; *Wofford*, 78 F.R.D. at 470 ("A company cannot legally use grooming regulations as a pretext for refusal to hire Black applicants."); *but see Rogers*, 527 F.Supp. at 232. Eatman, however, has neither shown that the policy severely impacts African–Americans as a class, nor presented any evidence that the policy lacks a legitimate business purpose. Thus, his circumstantial evidence that most of the employees affected by the policy are black would not, on its own, reasonably support a finding of discriminatory intent against African–Americans.

Eatman also contends that a sufficient inference of discriminatory animus arises from several incidents in which UPS allegedly exhibited racial hostility towards him. Eatman asserts that once he started wearing locks, various managers told him that he looked like an alien and like Stevie Wonder, twice compared his hair to "shit," equated his hair with "extracurricular" drug use, requested a pair of scissors (as if to cut off the locks), and pulled his hair, and that an unnamed UPS employee hung a derogatory sign on his UPS truck. (Eatman Aff. ¶¶ 7–12.)

These comments and abuse, while hurtful, sophomoric and insulting, are not racist in nature and do not support a reasonable inference of racial discrimination. Apparently recognizing this, Eatman argues that "[s]ince locked hair is a characteristic of African–Americans, every time members of UPS management made a comment degrading [his] hair, they were also degrading his race." (Pl.'s Opp. at 10.) Locked hair, however, is not so closely associated with black people that a racially neutral comment denigrating it can reasonably be understood as a reflection of discriminatory animus, at least where there is no objective evidence that the speaker perceived the plaintiff's locked hair as related to his race. *See Hines v. Hillside Children's Ctr.,* 73 F.Supp.2d 308, 316 (W.D.N.Y.1999) (statement that black plaintiff's dreadlocks set poor example for children cannot reasonably be interpreted as evidence of racial animus) (citing *EEOC v. United Virginia Bank/Seaboard Nat'l,* 615 F.2d 147, 155 (4th Cir.1980)); *Miller v. CCC Info. Sys., Inc.,* No. 95 C 6612, 1996 WL 480370, at *3 (N.D.Ill. Aug. 22, 1996); *Bey v. Village of Arlington Heights,* No. 88 C 5479, 1991 WL 42165, at *15 (N.D.Ill. Mar. 22, 1991).

Even assuming that some of these comments did reflect discriminatory animus, they were, with only one exception, made by non-decisionmakers, and "the bias of a non-decisionmaker is insufficient to prove an illegal motivation for an employer's discharge" *O'Sullivan v. New York Times,* 37 F.Supp.2d 307, 321 (S.D.N.Y.1999) (citing *McLee v. Chrysler Corp.,* 109 F.3d 130, 136 (2d Cir.1997)). The one exception is James Surace's alleged comment that Eatman looked like Stevie Wonder. (Eatman Aff. ¶ 10.) While Surace, as Eatman's direct supervisor, at least arguably had "substantial influence" over Eatman's employment, *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 410 (2d Cir.1991), his particular comment, standing alone, cannot

be understood as a racist remark, and thus does not give rise to a triable issue of material fact.

In granting summary judgment on this claim, the Court is mindful that a factfinder's disbelief of the reasons put forward by the employer to justify its adverse employment action may, together with the elements of the prima facie case, alone suffice to show intentional discrimination. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *James,* 233 F.3d at 156; *Fisher v. Vassar College,* 114 F.3d 1332, 1333 (2d Cir.1997) (en banc). The probative value of Eatman's evidence that UPS is dissembling about its reason for terminating him, however, is insufficient to transform his prima facie case into one appropriate for submission to a jury. His allegation that other, unidentified drivers with "unconventional" hairstyles did not always wear hats, or at least *wool* hats, does indeed tend to show that UPS does not always strictly enforce its appearance guidelines, and, by extension, that UPS may have terminated Eatman for reasons other than his non-compliance. (Eatman Dep. at 60–61.) Because those other drivers included black drivers with locks, however, Eatman's allegation does not logically support the inference that UPS is dissembling in order to cover up its discriminatory animus towards African–Americans. *See id.* at 1337–38; *Rookard v. Kateri Residence, Inc.,* No. 98 Civ 8301, 2001 WL 180119, at *7 (S.D.N.Y. Feb. 22, 2001) (citing *Balut v. Loral Elec. Sys.,* 988 F.Supp. 339, 349 (S.D.N.Y.1997), *aff'd,* 166 F.3d 1199 (2d Cir.1998)). Rather, it supports an inference that UPS is dissembling "in order to hide a reason that is non-discriminatory but unbecoming or small-minded" such as "spite" or "personal hostility." *Fisher,* 114 F.3d at 1337.

In summary, the totality of Eatman's evidence is insufficient to support a reasonable inference that prohibited discrimi-

nation occurred when UPS suspended and terminated him. *See James,* 233 F.3d at 156. His evidence is also insufficient to raise the inference that he was subjected to an alleged hostile work environment "because of" his race. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001); *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir. 1999); *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 836 (6th Cir.1996). Summary judgment is therefore granted in favor of UPS on all of Eatman's intentional racial discrimination claims.

### D. *Disparate Impact*

■ In addition to his intentional discrimination claims, Eatman alleges that UPS's hat policy disparately impacts African–Americans. To support this claim, Eatman points to the evidence that seventeen out of the eighteen UPS employees who are required to wear hats over their "unconventional" hairstyles are black, as well as expert testimony that wearing a wool hat over locks tends to destroy the locks. As this evidence suggests, Eatman's primary challenge is to the hat requirement itself—to the simple fact that UPS requires a disproportionate number of black employees to wear hats. Secondarily, he seems to challenge the hat policy's effective termination of those African–Americans (1) whose particular "unconventional" hairstyle is locks, (2) whom UPS requires to wear *wool* hats that are incompatible with locks, and (3) who refuse to either wear the wool hats or remove the locks, and suffer termination as a result. *See Bradley v. Pizzaco of Nebraska, Inc.,* 939 F.2d 610, 612–13 (8th Cir.1991); *Richardson v. Quik Trip Corp.,* 591 F.Supp. 1151, 1155 (S.D.Iowa 1984). The Court will not address the second theory because there is no evidence in the record that any African–American employee besides Eat-

man was affected by that particular employment practice. With respect to the first theory, the Court assumes that a hat requirement for "unconventional" hairstyles may amount, in and of itself, to a cognizable adverse employment action, *see Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000), but nonetheless rejects the claim for the following reasons.

■ An employer violates Title VII under the disparate impact theory if it maintains a "specific employment practice," *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), that, although facially neutral, "in fact fall[s] more harshly on one group than another and cannot be justified by business necessity," *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Discriminatory intent need not be proven, *see id.* at 432, 91 S.Ct. 849, the theory can apply to either objective or subjective practices, *see Watson,* 487 U.S. at 991, 108 S.Ct. 2777, and those practices can turn on either immutable characteristics, *see Dothard v. Rawlinson,* 433 U.S. 321, 328, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (height and weight requirements); *Pizzaco,* 939 F.2d at 612 (skin condition), or difficult to change characteristics, *see Griggs,* 401 U.S. at 427–28, 91 S.Ct. 849 (high school diploma and performance on standardized employment tests); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (methadone addiction), regardless of whether or not reliance on those characteristics serves to perpetuate the effects of pre-Title VII intentional discrimination, *see Watson,* 487 U.S. at 988, 108 S.Ct. 2777. The underlying purpose of the theory, however, is to root out " 'barriers' "

to "equality of employment 'opportunities,'" *Connecticut v. Teal*, 457 U.S. 440, 449, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (quoting *Griggs*, 401 U.S. at 429–30, 91 S.Ct. 849), that, although "adopted without a discriminatory motive, may in operation be functionally equivalent to intentional discrimination," *Watson*, 487 U.S. at 987, 108 S.Ct. 2777.

■ Assuming that a clearly articulated appearance policy proscribing a trait, factor, or characteristic that is specifically and wholly within an individual's control could ever constitute a "barrier" functionally equivalent to intentional discrimination, *see Batson v. Powell*, 912 F.Supp. 565, 572 (D.D.C.1996), *aff'd*, 203 F.3d 51 (D.C.Cir.1999), the law requires that before the employer becomes obligated to explain the business necessity of its policy, a plaintiff must make out a prima facie case by presenting "statistical evidence 'of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Smith v. Xerox Corp.*, 196 F.3d 358, 365 (2d Cir.1999) (quoting *Watson*, 487 U.S. at 994, 108 S.Ct. 2777); *see also Dothard*, 433 U.S. at 329, 97 S.Ct. 2720 ("a plaintiff need only show that the facially neutral standards in question select applicants ... in a significantly discriminatory pattern").

Where, as here, a plaintiff alleges that a policy disparately impacts existing employees, the relevant population for statistical analysis consists of those employees potentially subject to the policy. *See Smith*, 196 F.3d at 368.[1] That population "is divided

into protected and non-protected groups and the selection rates of the two groups are compared." *Id.* When it is clear that the specific policy being challenged is the cause of any differential in selection rates, as it would be here, the ultimate question becomes whether that differential "will be considered to constitute disparate impact." *Id.* Although "the substantiality of a disparity is judged on a case-by-case basis," the Second Circuit often looks to whether the selection rate for the protected group is less than four-fifths of the rate for the group with the highest rate or whether the plaintiff has shown a statistically significant disparity of two standard deviations. *Id.* at 365–66.

Eatman has failed to adduce evidence of (1) the relevant population of UPS employees who must wear their hair in a "businesslike" fashion or else wear a hat, (2) the rate of selection of the African–Americans in the relevant population (i.e., the percentage of African–American employees who do not have to wear a hat), and (3) the rate of selection of all others in the relevant population (i.e., the percentage of non-black employees who do not have to wear a hat). Eatman has shown only that a large percentage of those employees with what UPS considers "unbusinesslike" hair are black employees. That statistical showing does not constitute a prima facie showing of disparate impact. *See Batson*, 912 F.Supp. at 572. Eatman's disparate impact claim must therefore be dismissed.

## II. *Religious Discrimination Claim*

■ In addition to his racial discrimination claims, Eatman advances a religious

[1] Alternatively, a plaintiff may be able to point to evidence that a disproportionate number of the protected class in the general population have the characteristic which triggers the onerous appearance requirement. *See Pizzaco*, 939 F.2d at 613 (identifying percentage of African–American males in the general population suffering from skin condi-

tion that makes compliance with no-beard policy onerous). Perhaps given the difficulty of identifying those persons in the general population who have hairstyles that UPS would regard as "unconventional," Eatman has chosen to focus on the impact that the hat policy has in fact had on existing UPS employees.

discrimination claim based upon UPS's alleged failure to accommodate his locks with anything but a wool hat. "Under Title VII, an employer cannot discriminate against any employee's religious practices unless the employer can show it cannot reasonably accommodate the practice without undue hardship on the conduct of the employer's business." *Kalsi v. New York City Transit Auth.*, 62 F.Supp.2d 745, 756 (E.D.N.Y.1998) (citing 42 U.S.C. § 2000e(j)), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986), *aff'g.* 757 F.2d 476 (2d Cir. 1985); *Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir.2001). To make out a prima facie case of religious discrimination, a plaintiff must show that (1) he held a bona fide religious belief conflicting with an employment requirement, (2) he informed his employer of the belief, and (3) he was disciplined for failure to comply with the conflicting employment requirement. *See id.* (citing *Philbrook*, 757 F.2d at 481).

■ With respect to the first prong of the prima facie case, UPS argues that Eatman has admitted at his deposition and in his affidavit in opposition to this motion that he does not hold a bona fide religious belief requiring him to wear locks. A court's limited role in determining whether a belief is "religious" is the same under Title VII as it is under the Free Exercise Clause of the First Amendment. *See Philbrook*, 757 F.2d at 481. The inquiry is twofold: "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious.'" *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984) (quoting *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)); *Welsh v. United States*, 398 U.S. 333, 339, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir.1999);

*Redmond v. GAF Corp.*, 574 F.2d 897, 901 n. 12 (7th Cir.1978).

UPS does not challenge the sincerity of Eatman's religious devotion; rather, UPS contends that Eatman's decision to wear locks is, "in his own scheme of things," not a religious act but a personal choice. *See Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir.1998) ("Title VII does not protect secular preferences."). Courts, congenitally incapable of judging the religious nature of an adherent's beliefs based on their content, employ a "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Patrick*, 745 F.2d at 157 (citing *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 713–15, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)); *International Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 439 (2d Cir.1981). In this approach, a person's claim "'that his belief is an essential part of a religious faith must be given great weight.'" *Patrick*, 745 F.2d at 158 (quoting *Seeger*, 380 U.S. at 184, 85 S.Ct. 850). "Impulses prompted by dictates of conscience as well as those engendered by divine commands are therefore safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature." *Id.* A person's "intellectual" concerns, however, are not safeguarded. *Barber*, 650 F.2d at 440.

■ There is no dispute that Eatman's impulse to grow locks was not prompted by a dictate of his religious conscience or engendered by a divine command. In his affidavit, Eatman candidly admits that "[w]earing my locks is a personal choice I have made in my life." (Eatman Aff. ¶ 3.) Nowhere does he claim that his own religious tenets require or dictate that particular hairstyle, or that locks are an essential part of his faith. This testimony is

consistent with the testimony Eatman gave at his deposition, in which he conceded that "locks are a choice" and "not a mandate." (Eatman Dep. at 32–33.) In light of this testimony, it is not enough that Eatman also considers his locks a "testament" or an "outward expression" of his commitment to Protestantism and the principles of Nubianism. (Eatman Aff. ¶¶ 2, 4.)

In any event, even assuming that Eatman's locks were required by his religion, there is no material issue of fact that, by failing to inform UPS of the conflict between his religious practice and UPS's hat policy, he has failed to satisfy the second prong of a prima facie case. It is clear that Eatman's refusal to wear a hat did not stem from a religious aversion to hats. To the contrary, Eatman admits that neither Protestantism nor Nubianism proscribes hats, and in fact offered, and continues to offer, to wear his own cotton hat to cover his locks. (Eatman Dep. at 41, 49–50, 83–84; Eatman Aff. ¶ 17.) Rather, Eatman's claim seems to be that the specific *wool* hat that UPS allegedly forced him to wear destroys his locks and for that reason is incompatible with his religious beliefs. (Eatman Aff. ¶¶ 16–17; Evans Aff. ¶¶ 3–4; Pl.'s Opp. at 24.) While a jury could conclude that Eatman informed UPS that he felt the hat policy was "discriminatory," that the wool hat gave him headaches and made him feel faint, and that "stress" was making his hair fall off (Eatman Aff. ¶¶ 16–17, Ex. B at 14–17; Eatman Dep. at 36–37), there is no evidence in the record that Eatman ever informed UPS that the wool hat destroyed his locks in such a way as to conflict with his religious beliefs, (Surace Dep. at 27; Schultz Dep. at 66–68; Schultz Decl. Ex. C). UPS cannot be expected to alleviate a religious conflict of which it is unaware. *See Knight*, 275 F.3d at 167–68. Thus, Eatman has failed to adduce evidence sufficient to make out either of the first two prongs of a prima

facie case, and his religious discrimination claim must be dismissed along with his racial discrimination claims.

### III. *Retaliation Claim*

Finally, Eatman alleges that UPS fired him in retaliation for complaining about discrimination. *See* 42 U.S.C. § 2000e–3(a). "In order to defeat a motion for summary judgment addressed to a claim of retaliation ... the plaintiff must first present sufficient evidence to make out a prima facie case, that is, evidence sufficient to permit a rational trier of fact to find [1] that [he] 'engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.' " *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir.2001) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir.1990)). Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained of action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998). "Third, if the defendant meets its burden, plaintiff must adduce evidence sufficient to raise a fact issue as to whether [the employer]'s reason was merely a pretext for retaliation." *Id.* at 769 (quotation omitted) (alteration in original).

The Court will assume that Eatman has established a prima facie case of retaliation. UPS, in turn, has come forward with a legitimate, non-retaliatory reason for terminating him—he refused to comply with the UPS appearance guideline requiring "businesslike" hair. (Eatman Dep. at 53–56; Vicente Dep. at 184–85, 190; Schultz Decl. ¶¶ 12, 15.)

 Any presumption of discrimination having dropped out of the picture, an independent review of the record reveals that there is insufficient evidence for a reasonable jury to conclude that UPS's purported reliance on the guideline was subterfuge for retaliatory discrimination. According to Eatman, he first complained about discrimination in June 1996 and continued to complain intermittently for the next two years. (Eatman Aff. Ex. B.) UPS, however, took no adverse employment action against him until the summer of 1998, and then only after managers specifically warned him that he would be suspended and then terminated if he continued to refuse to cover his hair. (Vicente Dep. at 185–85; Schultz Decl. ¶ 15.) Neither these circumstances nor any other facts in the record raise the inference that UPS fired Eatman because of his complaints.

## CONCLUSION

For the reasons set forth above, UPS's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly.