Ratha WINDHAM, Vernell Curry and Greg Wilson, Plaintiffs–Appellants,

v.

TIME WARNER, INC., Defendant–Appellee.

Docket No. 00–7203.

United States Court of Appeals, Second Circuit.

Argued Nov. 28, 2000.

Decided Dec. 12, 2001.

Patrick H. Barth, New York, NY, for Plaintiffs–Appellants.

Katherine B. Forrest, Cravath, Swaine & Moore, New York, NY, for Appellee.

Before McLAUGHLIN and POOLER, Circuit Judges, and DRONEY, District Judge *.

* The Honorable Christopher F. Droney, United States District Court Judge for the District of Connecticut, sitting by designation.

POOLER, Circuit Judge:

Plaintiffs Ratha Windham, Vernell Curry and Gregory Wilson, all African Americans, worked in Time Warner Inc.'s ("Time") accounts payable department (the "Department"). A reduction in the Department's workload required jobs be eliminated. Time chose to terminate plaintiffs, who represented three-quarters of the Department's African American employees. None of the Caucasian employees was terminated. Plaintiffs brought suit in the United States District Court for the Southern District of New York (Denise L. Cote, *J.*), alleging, among other things, employment discrimination. The district court granted Time's motion for summary judgment, finding plaintiffs failed to rebut Time's legitimate, nondiscriminatory reasons for termination. For the reasons given below, we find the district court failed to properly evaluate the evidence, and we vacate and remand.

## BACKGROUND

### Rationale for Terminating Plaintiffs

Windham, Curry, and Wilson are all African American. The three were employed in Time's Department of Accounting Services, which receives, processes and pays bills for Time Warner Corporate and several of its affiliated companies. Mary Harvey, a Caucasian woman, managed the Department with her assistant manager, Fran Buonanoce, also a Caucasian woman.

Curry and Amor Zaide, a Filipina, were both accounts payable supervisors, responsible for processing invoices. Curry was responsible for A through L and Zaide for M through Z. In addition, Zaide handled bills from Warner Communications, Inc. and Time Warner Entertainment, two af-

filiated companies. Kathleen McLoughlin, a Caucasian woman, worked as a senior accounts payable clerk. Wilson and Elba Torres, a Hispanic woman, were the accounts payable clerks. Joyce Sherman, a Caucasian woman, reviewed and processed travel and expense (T & E) reports and invoices. Jack Simmons, a Caucasian male, was the Department's receptionist.

Windham supervised the printing and disbursement of checks to pay vendors. She also supervised the maintenance of accounts payable files and handled vendor inquiries regarding invoices to be disbursed. She was assisted by clerk Jerryl Bell, an African–American male.

In April 1995, Warner Music Group ("WMG") decided to pay its own bills, decreasing the Department's workload. Shortly after WMG made its decision, Joe Morello, Time Warner's chief accountant and Harvey's supervisor, told her she should consider reducing her staff. Harvey began to act on Morello's request in late summer of 1995, eventually deciding to terminate Windham, Curry and Wilson.

On Tuesday, October 10, 1995, Harvey met with Karen Mangione and Michael Watson, Time's corporate human resources managers. She identified the three African American plaintiffs as the sole candidates for job elimination in the Department. Harvey's choices drew some concern. Priscilla Bijur, Time's vice president for corporate human resources, told Morello in an October 12, 1995 memorandum that "[b]ecause of the composition of the employees who would be affected, I would like to meet with you to review the rationale behind the selection of each employee to ensure that these decisions are being made without regard to race, sex or age."

Harvey outlined her rationale for choosing the plaintiffs in memoranda dated November 7, 1995. Harvey explained Wind-

ham's job should be eliminated because the disbursing group had lost work due to three significant changes: conversion from McCormick & Dodge ("M & D") software to Oracle software; elimination of WMG as a consumer of check-issuing services; and a decrease in check printing for two other Time entities. The elimination of the WMG work resulted in a decrease from 5,588 WMG checks printed in 1994 to 1,757 WMG checks printed in 1995. Reductions in work for the two other Time Warner entities resulted in a decrease from 53,175 checks to 44,978 checks.

Harvey initially represented that the Oracle software cut the amount of check disbursing work because each check had to be manually stamped with the M & D software, while the Oracle software printed the signatures on the check at the same time as the other required information. Harvey later admitted, however, that this was untrue and that she knew it to be untrue when Windham was fired. The Oracle software used blank check stock, while the old M & D check stock came preprinted with the bank routing and check numbers. The risk of forgery, Harvey maintained, was greater with the M & D stock. Converting to Oracle, then, reduced security concerns, which alleviated the need to have a supervisor handle the blank check stock. Harvey said that while Windham and Bell both matched checks to invoices, Bell did most of this group's work. With respect to other functions of the disbursing department, Harvey claimed the disbursing clerk requested all backup, which had decreased since the advent of the Oracle system, and did all filing. Harvey stated she and Buonanoce ordered all check stock, envelope stock and traveler's checks. Finally, she indicated Windham and Bell both perforated check copies. Based on this description of the disbursing group's function and the break-

down of responsibilities between the disbursing supervisor and the disbursing clerk, Harvey concluded the group's work could be handled by someone in a clerical position and noted Bell already held that position.

Harvey also concluded that one of the two current invoice processing supervisors, Curry and Zaide, was not needed because of the change from M & D to Oracle and accompanying policy changes. Under the M & D system, Harvey said, the supervisors spent most of their day coding invoices, but management had decided to make each department code its own invoices under the Oracle system. With respect to those invoices that slipped through to accounts payable without codes, Harvey claimed Zaide routinely researched and filled in the appropriate code but Curry refused to do so and left them on Harvey's desk for Harvey to complete. In addition, Harvey said, M & D routinely generated reports which needed to be checked by the supervisors each day. Oracle did not automatically generate the necessary reports. Instead, Harvey ran reports each morning before 9 a.m. so checks could be printed and approved by 11 a.m. Harvey trained Zaide to run these reports, so that she could serve as backup if both Harvey and Buonanoce were absent. Harvey said she did not choose Curry as a backup because Curry was habitually late and thus could not do the job when it needed to be done. Harvey also claimed the Oracle software eliminated other jobs formerly performed by the supervisors, such as voiding checks and placing stop payments. Harvey gave Zaide responsibility for performing these tasks if she and Buonanoce were both absent. Harvey explained she did not ask Curry to do these reports because Curry's knowledge of Oracle was limited. Harvey also noted that since Oracle was installed, management had shifted responsibility for setting up new vendors from the Department to the purchasing department. Harvey concluded the reduced volume of invoices, along with the reduced responsibilities of the accounts processing supervisors, eliminated the need for one of the supervisors in the accounts processing group.

Harvey chose to terminate Curry. Harvey described Curry as chronically late, someone who left the floor without permission or notice, did not take her lunch at assigned times, closed her door when it was supposed to be open, spent an excessive amount of time in Windham's office discussing personal matters, and spent too much time on personal phone calls. As a consequence, Harvey said, Curry rarely finished her work on time and needed help from coworkers. In contrast, Harvey said Zaide often did inputting for clerks in other groups after finishing her own work and always took her lunch at the appointed time.

Harvey also decided that the Department needed only one key punch/data processing operator ("operator"). Harvey said her decision was based on changes in the Department, including: (1) operators no longer inputted WMG invoices; (2) the T & E clerk inputted all T & E reports; (3) Zaide inputted all the taxes and priorities; (4) Zaide or the Department managers inputted all magazine subscriptions; and (5) the decreased volume of invoices. Harvey recommended eliminating Wilson because he had excessive unplanned absences, was often late, made many personal calls and spent too much time talking to co-workers. In contrast, Harvey said, when Torres completed her own work—and Wilson's—she asked if anyone needed help.

Harvey notified all three employees they were to be terminated November 9, 1995. In an unrelated incident, Mangione fired

Bell on January 23, 1996, after he engaged in unprofessional conduct in her office. Harvey was not involved in the decision. Harvey replaced Bell with Savee Beharry, a Trinindadian woman.

### Equal Opportunity Commission

Windham, Curry and Wilson all filed complaints with the United States Equal Opportunity Commission. ("EEOC") in June 1996. Time responded with position statements asserting plaintiffs were not discriminated against because each position was eliminated due to a decreased workload. Specifically, Time said it eliminated Windham because of the decrease in the number of checks and the adoption of the Oracle system. As to Curry, Time said the Oracle software eliminated much of the accounting supervisors' work, the purchasing department had taken over the task of setting up files for new vendors, and WMG was no longer using the Department, all of which rendered Curry unnecessary. Time did not compare Curry's and Zaide's performance or their work habits. Instead, it relied on Zaide's status as an Asian Pacific Islander and the failure to replace Curry to refute any inference of discrimination.

Time justified Wilson's termination by stating that the elimination of the WMG invoices resulted in a decreased workload for the Department. Time also indicated Wilson's other inputting duties had decreased. In particular, Time claimed that in early 1995, T & E entries, formerly handled by all of the clerks, were assigned to Joyce Sherman. Again, Time did not seek to justify its termination by comparing Wilson to the clerks that remained, including Sherman and Torres.

In June 1997, an EEOC investigator interviewed Harvey by phone. Harvey maintained that the Oracle system had cut the Department's work in half. She also indicated that changes in accounting policy and loss of WMG reduced the Department's workload. Harvey said she met with Morello in April 1995 to discuss downsizing, and Morello asked her to develop a list of positions to eliminate. Although Harvey admitted that there were several discussions among her, Mangione, and Watson, she contended nothing related to the terminations was reduced to writing. Harvey said she reviewed each position in the Department, focusing on employee productivity as tracked by the computer, knowledge of the computer system, and reliability. She also considered the reliability, performance, and responsibilities of the employees to be retained.

Harvey said Windham's job was eliminated solely as a result of the Oracle system's reduction of her job duties. She claimed that she retained Zaide over Curry because of Zaide's greater knowledge of the Oracle system and her ability to act as Harvey and Buonanoce's backup. She said Zaide also did more inputting than Curry, and had requested and been granted training on the new computer system. However, Harvey also indicated Curry was a good employee. Finally, Harvey said she retained Torres over Wilson because Torres was more positive and productive, took the initiative to ask for extra work and corrected errors in the reports. She also claimed that Torres asked for and received training on the computer system and that she did more inputting than Wilson, while Wilson did not take the initiative to learn more about the computer system. She did not mention absenteeism or lateness as a problem for Wilson and said that he was "a good employee."

On July 17, 1997, Time's attorneys sent EEOC a letter stating Harvey's claim that "everything involving the job elimination decision making process was done verbally" was incorrect. The letter said:

In fact, Ms. Harvey did commit certain aspects of her recommendation process to writing in three memoranda written November 7, 1995. At the time of the telephone interview, Ms. Harvey did not remember these memoranda, but we later found them in checking the facts recited in your notes.

The attorneys included copies of the November 7, 1995, memoranda, all of which were stamped "Privileged & Confidential Attorney Client Communication Prepared for Litigation."

EEOC rejected all three plaintiffs' charges, sending dismissal and right to sue notices to Curry and Wilson on September 16, 1997, and to Windham on September 25, 1997.

*Summary judgment*

Windham filed a complaint in the United States District Court for the Southern District of New York on January 20, 1998. Curry and Wilson filed their complaints on February 24, 1998. Each of the actions alleged, among other things, race-based employment discrimination. Eventually, all three actions were consolidated. After completing extensive discovery, Time moved for summary judgment on October 1, 1999.

In an affidavit submitted in support of Time's motion for summary judgment, Harvey gave a more detailed description of the work flow of the Department. She said Simmons, the receptionist, received all invoices coming into the Department. He separated them, giving Curry all invoices from vendors with names A through L for corporate, Zaide all invoices M through Z for corporate and all invoices for Time Warner Entertainment Co. and Warner Communications, McLoughlin all invoices for WMG, Warner Services, and GTC, and Sherman all T & E reports. Curry, Zaide, and McLoughlin then audited the invoices, and Sherman audited and inputted the T &

E reports. Curry, Zaide, McLoughlin, and Sherman batched the invoices and gave them to the clerks, who inputted them into the computer system. Harvey or Buonanoce then ran a batch report, an exception report, and a print check report. The exception report told them if there were any mistakes, while the batch report told them who set up the batch, who keyed the batch into the system, and the number of invoices in the batch. Harvey or Buonanoce then created check file reports and gave those to Windham to print the checks. Windham printed the checks and check copies. Bell stapled the check copies to invoices and gave them to Harvey or Buonanoce to review. Bell then distributed the checks to different supervisors outside the Department. After approving the checks, the supervisors gave them to Simmons, who mailed them out and returned the copies to Bell for filing.

In her affidavit, Harvey claimed she noticed the Department was overstaffed a few weeks after she began her stint as manager in April 1994. She said Morello told her to consider staff reductions in May 1995. However, Harvey did not begin to consider staff reductions until August or September 1995. She actively assessed which jobs to terminate between August and October of 1995. She claimed to have made several drafts of her conclusions, finalized in the November 7, 1995, memoranda belatedly given to the EEOC.

Harvey claimed she decided to eliminate Windham's job because she observed that her main responsibility was to print checks and check copies on a high speed laser printer. She alleged Windham did regular check runs only twice a week, each taking two hours maximum. On other days, Harvey said, Windham ran only tax department and priority checks, which took a matter of minutes to complete. Harvey said Bell did most of the disbursing

group's work. Harvey also ran year-to-date check reports in August or September, and found the number of checks had declined. On most days, Harvey said, Windham finished her work by noon and Bell by about 3:00 p.m.

Harvey said she decided she could eliminate one of the two accounts payable supervisors without impacting the workload of the Department. Harvey did not include McLoughlin when comparing employees, despite her prior explanation that McLoughlin did basically the same work as Torres and Curry, albeit for different entities. Harvey explained that in addition to the WMG work, which the department lost, McLoughlin was responsible for Warner Services invoices and GTC invoices, knew the vendors for these companies, and could identify the invoices. She also handled foreign invoices and was the only employee in the Department who understood how to use a currency-conversion software program. Finally, McLoughlin was more willing than anyone else in the Department to pitch in to do any required work. Nor did Harvey include Sherman, who did the T & E work, in her employee comparisons. Harvey indicated that she did not job eliminate Sherman because "more than any other employee her job stood alone" as she was exclusively responsible for the T & E reports and it would take a long time to train another employee to audit the T & E reports. In addition, Harvey claimed Sherman was a reliable employee who never took sick days. Harvey's reasons for choosing to retain Zaide over Curry were similar to those articulated in the November 7, 1995 memorandum, discussed above.

Harvey's reasons for choosing Wilson over Torres also mirror those set forth in the November 7, 1995 memorandum. However, Harvey added a claim that Buonanoce reviewed invoice runs for January through September 1995 and October 1 through October 27, 1995 and found Wilson inputted fewer invoices than Torres. These reports showed Wilson input 11,288 invoices from January through September and Torres 15,730 for the same period. The October figures showed Torres at 1,459 and Wilson at 909. Harvey claimed she had a good relationship with both Wilson and Curry. She said she sent Wilson for additional computer training in early 1995 or late 1994, because she had noticed he was interested in that area and wanted him to serve as Buonanoce's backup when she was absent. However, Harvey claimed Wilson's interest in computers waned, so she herself took over Buonanoce's duties when Buonanoce was out on maternity leave.

Harvey did not consider eliminating her own position because the department needed a manager and she did much of the work of the Department, including filing and printing checks. She did not consider Buonanoce because she acted as manager when Harvey was not at work and was needed "because only a limited number of employees, including me and Buonanoce have access to all facets of the system because of security concerns." In addition, Buonanoce had computer training "and was particularly knowledgeable in Oracle." Finally, Harvey did not consider eliminating Simmons' job because he was responsible for answering phones for other departments. However, when Simmons was terminated in 1997, Harvey did not replace him, instead requiring current employees to fill in on a rotating basis.

The district court granted Time's motion. *Windham v. Time Warner*, 2000 WL 91935 (S.D.N.Y. Jan.26, 2000). The district court assumed each plaintiff had met the *de minimis* burden of raising issues of fact sufficient to support a *prima facie* case, although it expressed doubt

that Windham met this burden because she was compared to Bell, who also is African American. *Id.*, at * 6 n. 4. The district court also found Time met "its burden of providing evidence of nondiscriminatory reasons for each of the three employment decisions it made in 1995." *Id.*, at *6. More specifically, the district court explained that because the reduction in force had remained in effect for more than four years, "there can be no credible claim that the decision to downsize was a subterfuge for discrimination." *Id.* Identifying the crucial question as "whether each plaintiff has presented sufficient evidence to create an issue of material fact that the reasons given for the elimination of their jobs were pretextual and that Time acted with discriminatory intent," the district court found that they had not. *Id.* at *6–*10.

This appeal followed. Plaintiffs' primary argument is that the district court's errors in assessing their evidence resulted in a mistaken finding that they failed to create material issues of fact on pretext and discrimination.

## DISCUSSION

We review grants of summary judgment *de novo*. *Bickerstaff v. Vassar College*, 196 F.3d 435, 445 (2d Cir.1999). Summary judgment may be granted only where there are no genuine issues as to any material fact. *Id.* Summary judgment is inappropriate if a review of the record shows sufficient evidence to permit a rational juror to find in plaintiffs' favor. *Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir.1992).

### I. Analytical Framework

■■■ In discriminatory treatment cases, plaintiff must first establish a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). Plaintiffs meet this burden by showing through direct or circumstantial evidence, that (1) they were within a protected group; (2) they were qualified for the positions; (3) they were discharged; and (4) "the discharge occurred under circumstances giving rise to an inference of discrimination." *Burger v. New York Inst. of Tech.*, 94 F.3d 830, 833 (2d Cir.1996). The burden of making out the *prima facie* case is "minimal." *Bickerstaff*, 196 F.3d at 446. In the context of "a reduction in force, the inquiry is highly fact specific," *Burger*, 94 F.3d at 833, and plaintiffs must demonstrate not that they were qualified for the eliminated jobs but rather for other existing jobs. *Maresco*, 964 F.2d at 111. Once plaintiffs demonstrate evidence sufficient to support a prima facie case, the employer must produce evidence to show plaintiffs were rejected, "or someone else was preferred, for a legitimate non-discriminatory reason." *Reeves*, 530 U.S. at 142, 120 S.Ct. at 2106 (internal quotation marks omitted). Plaintiffs then have the ultimate burden of proving "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■■■ "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. at 2109. After *Reeves*, the court must examine each case to "determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Schnabel v.*

*Abramson,* 232 F.3d 83, 90 (2d Cir.2000) (quotation marks and citation omitted). Showing the employer's proffered legitimate explanation for termination is not worthy of belief is "one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves,* 530 U.S. at 147, 120 S.Ct. at 2108–09 (internal citation omitted).

## II. Plaintiff's Prima Facie Case

■ The district court assumed *arguendo* that plaintiffs made out their prima facie case. However, the court also questioned Windham's ability to prove facts from which the jury could infer discrimination in light of Bell's assumption of Windham's duties. *Windham,* 2000 WL 91935, at *6 n. 4. We find plaintiffs met their *de minimis* burden of making out a prima facie case. All three are African Americans and thus members of a protected group. Time retained an accounts payable supervisor job, a duplicate of the job Curry held, and an operator's job, a duplicate of the job Wilson held. The record also shows the disbursing clerk-whose job was retained-mainly did filing, and that Windham often helped with the filing. All three therefore showed they were qualified for a job that remained. Each of the three was discharged. Finally, Windham and each of the other plaintiffs offered evidence supporting an inference of discrimination by proving that the accounts payable department terminated three of its four African American employees and none of its Caucasian, Hispanic, or Asian employees. Such a showing is sufficient to make out plaintiffs' *prima facie* case. In *Maresco* we found, "[t]he decision to terminate two of the three older accounting employees, and none of the twenty younger employees, presents circumstances which give rise to an inference sufficient to withstand a motion for summary judgment that age was impermissibly considered in allocating the post-consolidation employment positions." *Maresco,* 964 F.2d at 113. Thus, each of the plaintiffs met their burden of making out a *prima facie* case.

## III. Time's Burden of Producing Evidence of a Legitimate Business Reason

■ We agree with the district court that Time met its burden of producing evidence of a legitimate business reason for the terminations by demonstrating that the Department had less work. *Windham,* 2000 WL 91935, at *6. As outlined above, the company also met its burden of producing evidence of facially reasonable justifications for selecting each respective plaintiff for termination.

## IV. Plaintiffs' Burden to Show Pretext and Intent to Discriminate

The burden thus shifts to plaintiffs to show Time's reasons for targeting them for termination were pretextual and its true reason was discrimination. To accomplish this task, we find it helpful to separate Windham from Wilson and Curry because they worked in different parts of the Department.

### A. Windham

■ In each of her somewhat varying accounts of the reasons for terminating Windham, Harvey relied on the reduced workload caused by implementation of the Oracle system and the loss of WMG's business. Harvey claimed that neither Bell nor Windham was busy all day and that Windham was less busy than Bell. Harvey also contended that Bell performed most

of the functions of the disbursing group and that the group's work did not require a supervisor. There is substantial evidence to rebut each of these contentions. First, Windham herself testified that it took her longer to run the checks with Oracle than with M & D. Windham also disputed Harvey's account of her job duties, stating that in addition to the duties described by Harvey, she (1) matched the tissue copy of each check to the proper invoice, (2) informed departments that they could pick up checks, (3) filed necessary paperwork, (4) sent boxes to be archived, (5) disbursed checks, and (6) requested backup data when needed. Windham further denied Harvey's allegation that she was not busy all day and claimed Bell's work largely was limited to filing, although Windham also did filing. Windham described how Oracle added to her job duties in more detail in a memorandum she gave to Harvey on December 21, 1994. Windham also received a merit increase based on Harvey's October 1994 recommendation. Morello, who approved the raise several months after implementation of the Oracle system, testified Windham would not have been eligible for a merit increase unless she was fully occupied and busy. All of these factors create a question of material fact as to whether Oracle actually reduced or increased the workload of the disbursing group. Although it is uncontested that disbursing lost work from WMG and other Time Warner entities, this loss accounted for no more than 20% of the group's workload. Therefore, Windham created a material question of fact as to whether it was necessary to eliminate 50% of the Department's staff.

The district court rejected Windham's claim that she was busy all the time because Time Warner did not replace Windham in the four years between the termination and the summary judgment motion.

*Windham*, 2000 WL 91935, at *6. However, there is evidence to suggest the group was understaffed. In 1996, Harvey wrote an evaluation of Savee Beharry, the employee who ultimately replaced Bell, criticizing Beharry's ability to handle all but the most clerical duties of the disbursing group. Harvey proposed that Beharry should handle just the files while Harvey would print the checks; Harvey, supervisors and key punch operators would match checks; and Harvey would separate the checks and give them to the receptionist for mailing or pickup. On a motion for summary judgment, all inferences are drawn in favor of the nonmoving party. *Maresco*, 964 F.2d at 110. Thus, while Harvey blamed the problems on Beharry's work ethic, a reasonable fact finder certainly could infer there was too much work in the disbursing group for one employee, and a lower level clerical employee was not capable of handling the bulk of the work. This evidence, coupled with the termination of three of the four African Americans in the Department, brings Windham within the ambit of cases where plaintiff's *prima facie* case, together with defendant's lack of credibility, could allow a reasonable juror to infer the defendant's proffered reason is pretextual.

### B. Wilson and Curry

In her written statements, Harvey compared Wilson only to Torres. Similarly, she compared Windham only to Bell, and Curry only to Zaide. Thus, only African American employees or other minorities were ever seriously considered for discharge. Harvey claimed the Caucasian employees—Buonanoce, Sherman, and McLoughlin—had such unique and irreplaceable job responsibilities that they must be retained. However, Wilson and Curry argue Morello's instructions to consider all Department employees for termi-

nation, their job descriptions, and their jobs as actually performed compelled a much wider comparison. The district court rejected this argument because (1) there were differences in the job functions performed by the other employees and (2) even if Harvey made a bad business decision in terminating Curry and Wilson rather than Sherman, McLoughlin, or Buonanoce, the court could not review her decision absent evidence that it resulted from a discriminatory motive. *Windham*, 2000 WL 91935, at *9.

The district court failed to understand plaintiffs' argument. They do not attack Harvey's decision not to consider the Caucasian employees for elimination as merely a bad decision. Instead, they contend that Harvey acted directly contrary to Morello's instructions by not considering all employees for termination. Plaintiffs contend Harvey belatedly manufactured reasons for not considering Sherman, McLoughlin, and Buonanoce. Harvey's reasons for not considering these three surface first in her summary judgment affidavit and therefore are somewhat suspect. Her reasons are not included in her November 7, 1995, memoranda and she did not tell EEOC that she considered these three employees or their positions for elimination, although Time did state in conclusory fashion that she considered "each position." In her deposition testimony, Harvey said she looked only at "the reduction of the work load that was handled by the supervisors, the [key] punch operators and disbursing." Thus, there is a material issue of fact as to whether Harvey ever actually considered eliminating any Caucasian employees. Therefore, there is an issue of fact as to whether Harvey disregarded Morello's explicit instructions to consider all employees for termination and instead considered only African American and other minority employees.

Harvey's thoroughly undocumented decision not to consider Buonanoce, McLoughlin, or Sherman for termination resulted in none of the Caucasian employees being at risk for loss of their jobs, while only African American employees lost their jobs. In addition, some evidence suggests Harvey may have suspected Morello wanted her to eliminate McLoughlin's job. McLoughlin was promoted to her current job from a standard clerk position in October 1994, long after Harvey determined the Department was overstaffed. The evidence also suggests that Harvey may have articulated her concern about Curry's "habitual" lateness only after she guessed that Morello wanted her to eliminate McLoughlin. Finally, Harvey admittedly consolidated the T & E function in Sherman after she realized the Department was overstaffed, and a jury could infer Harvey was motivated by a concern for Sherman's job. From the admitted facts and the inferences raised by the record, a reasonable juror could find Harvey gave McLoughlin and Sherman additional responsibilities to make their jobs indispensable after she knew the department was overstaffed. In addition, because there is overwhelming evidence that almost all the other employees were also late, although perhaps not as frequently as Wilson and Curry, a reasonable juror could conclude Harvey's belated concern with Curry's lateness was pretextual and caused by her fear she might have to eliminate McLoughlin or one of the other Caucasian employees. Finally, all employees except Zaide made excessive personal phone calls and there is ample evidence all Department employees were underemployed and should have been considered for elimination. We therefore find both Curry and Wilson raised questions of material fact as to whether the reasons Time gave for their firings were pretextual and the true reason was discrimination.

## V. Spoliation

Plaintiffs also argue the failure of Time to retain preliminary drafts of Harvey's November 7, 1995 memoranda and other documentation related to the firings should be considered as spoliation and serve as grounds for reversal. Because we reverse the grant of summary judgment on other grounds, we need not reach the issue of spoliation, and trust the district court will address the issue if necessary.

## CONCLUSION

For the reasons given above, we vacate the grant of summary judgment and remand for further proceedings.