**Desiree M. CALABRO, Plaintiff,**

v.

**WESTCHESTER BMW, INC., Defendant.**

**No. 03 Civ. 5172(MHD).**

United States District Court, S.D. New York.

Nov. 10, 2005.

Leonard N. Flamm, Law Offices of Leonard N. Flamm, New York City, for plaintiff.

Maurizio Savoiardo, Zawacki, Everett, Gray & McLaughlin, New York City, for defendant.

### MEMORANDUM & ORDER

DOLINGER, United States Magistrate Judge.

Plaintiff Desiree M. Calabro commenced this pregnancy-discrimination lawsuit against her former employer, Westchester BMW, Inc. ("WBMW"), contending that defendant had terminated her in January 2003 because she was pregnant. Asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, and the New York State Human Rights Law, N.Y. Exec. L. §§ 296(1)(a) and 297(9), she seeks declaratory and injunctive relief, back pay, front pay, and compensatory and punitive damages. (*See* First Amended Complaint at § VIII). Defendant contends that it discharged plaintiff from her job as a car salesperson because she lacked a valid driver's license—a prerequisite of the job—and that although the discharge coincided with defendant's discovery of plaintiff's pregnancy, her pregnancy played no role in the decision to terminate her. (*See* Defendant's Memorandum of Law ("Deft's Memo") at 1–2).

With fact discovery completed, defendant has moved for summary judgment.

For reasons that follow, we deny the motion.

### THE FACTUAL RECORD

Desiree Calabro began her employment with WBMW in November 2001 as a Service Advisor, which is not a sales position. In June 2002, she was promoted to the position of Motoring Advisor, a sales position. Her job responsibilities included selling cars to prospective customers, recommending particular models to meet their needs, accompanying them on test drives, and, if necessary, performing demonstration drives. (Affidavit of Jeffry Rubin ("Rubin Aff."), Ex. B).

In November 2002, Calabro discovered she was pregnant but initially did not tell anyone at work of her condition. On January 16, 2003, she told Lori Abrams, WBMW's MINI Sales Manager and her immediate supervisor, that she was two months pregnant. Abrams congratulated her and promised to wait a month before informing higher management. (See Deposition of Lori Levinson–Abrams ("Abrams Dep.") at 51–53).

Meanwhile, also on January 16, 2003, WBMW submitted to the New York State Department of Motor Vehicles (the "DMV") an application for four additional dealer plates, including one under Calabro's name. At some point thereafter, DMV informed defendant that its application for that plate had been denied because Calabro had a suspended driver's license. (See Rubin Aff. at ¶ 13). Defendant's investigative agency, Sterling Testing Systems, confirmed on January 21, 2003 that Calabro's license had indeed been suspended as of January 18, 2003. (See Rubin Aff., Ex. D). According to Sterling, the reason for the suspension was that Calabro's insurance had lapsed. (Id.). Plaintiff testified that she had been unaware of the suspension at the time because her father had been paying insurance premiums for her, and the suspension had resulted from her father's inadvertent failure to make the monthly payments. (Deposition of Desiree M. Calabro ("Calabro Dep.") at 5).

WBMW's "Job Description for Motoring Advisor" is a two-page, outline-style document with five headings—"Summary", "Principal Duties and Responsibilities", "Expectations", "Expected characteristics of a successful Motoring Advisor", and "Physical and Work Demands". (Rubin Aff., Ex. B). It summarizes the Motoring Advisor's responsibilities as "delivering a high level of customer service through the presentation, sale and delivery of Mini vehicles and related products" and offering "preowned off brand vehicles, when customer needs dictate an alternative." (Id.). The "Principal Duties and Responsibilities" section lists fourteen such duties, including determining customer needs, offering test drives, suggesting suitable cars for customers' selection, and explaining the features of cars to customers. (See id.). The "Physical and Work Demands" section has eight bullet points, including "Valid driver's license, Ability to drive manual and automatic transmission vehicles, Walking or Standing for extended periods, Occasional bending, reaching and light lifting, . . . Minimum work schedule of 45 hours". (Id.).

The parties agree that plaintiff's job duties included accompanying customers on test drives, as well as taking them on so-called "demo" drives. (See Calabro Dep. at 93–94; Defendant's Reply Memorandum of Law ("Def't's Reply") at 3). On a test drive, the customer would drive the car and the Motoring Advisor merely "chaperoned" in the passenger seat, unless, on rare occasions, the customer decided to abandon the test drive midway, in which case the Advisor would have to drive the car back to MBMW's parking lot. On a demo drive, the Motoring Advisor would

drive the car and explain its features to the customer, who was a passenger. It is also uncontested that plaintiff repeatedly accompanied customers on test drives during her eight months as a Motoring Advisor, but only once took a customer on a demo drive. (Calabro Tr. at p. 94 li. 9–12).

Defendant's employee-evaluations records show that MBMW had rated plaintiff's job performance highly. In November and December 2002, just before being terminated, Calabro received perfect scores, 100%, in each enumerated category on her Dealer Employee (Customer Satisfaction) Scores Evaluation. (*See* Affidavit of Desiree M. Calabro ("Calabro Aff."), Ex. D at 1). In January 2003, the month of her termination, Calabro received a rolling three-month score of 93.2% and a customer satisfaction rating of 86.5%. (Calabro Aff., Ex. D at 2). Further, during plaintiff's employment WBMW did not document any shortcomings, lack of skills, or performance problems in her personnel file. (*See* Calabro Aff., Ex. A ("Mickler Dep.") at p. 21 li. 10–16).

On January 20, 2003—the day before confirmation of the suspension of plaintiff's license—WBMW held a managers' meeting, in which Abrams, fearing that management would learn about Calabro's pregnancy from another employee, told the managers that Calabro was pregnant. According to Abrams, on learning this information, Jeffry Rubin, the CEO of WBMW, "threw his hands up in the air and said, 'Oh, Great, Desiree is pregnant. Is she staying, is she going, what is she doing?'" As described by Abrams, Rubin "was very unhappy with the situation," while two other managers at the meeting also "groaned" in dismay. (Abrams Dep. at 78–79).

On January 23, 2003—three days after WBMW's management learned about plaintiff's pregnancy and two days after it had confirmed the suspension her license—Rubin told Abrams on the phone that Calabro's license had been suspended, and remarked "that it's a liability and that we needed to fire her." (Abrams Dep. at 32–33; p. 36 li. 16–20). Thereafter, Abrams informed Calabro of her termination. (*See* Calabro Dep. at p. 138 li. 12–15; Abrams Dep. at p. 39 li. 23 to p. 40 li. 7). Prior to this termination, defendant made no inquiry as to the reason for the license suspension or how quickly plaintiff could have her license reinstated. (*See* Mickler Dep. at p. 46 li. 16 to p. 47 li. 18; p. 49 li. 7–12; p. 50. li. 8–19).

The record contains some evidence that defendant may have accommodated a male employee, Michael Vincek, who had a suspended driver's license, by transferring him from a position requiring a driver's license (a Quality Control position) to a position not requiring one (a Dispatcher) and later transferring him back to the original position. An "Abstract of Driving Record" issued by the DMV shows that Vincek's driver's license had been suspended as of May 31, 2001 due to a May 11, 2001 conviction for Driving While Impaired, and that the license was restored on September 6, 2001. (Calabro Aff., Ex. B, Vincek 1). Vincek testified, without specifying the relevant dates of the following transfers, that he had been transferred from Quality Control to Dispatcher (Vincek Dep. at p. 8 li. 13–19), then back to Quality Control (*id.* at p. 8 li. 20–24), then back to Dispatcher, (*Id.* at p. 9 li. 4–16), and finally back to Quality Control, (*Id.* at p. 9 li. 17–22). Vincek's personnel record does not contain complete information regarding the timing of his numerous transfers. (*See* Calabro Aff., Ex. B, Vincek 2–9).

Thus, there is some uncertainty as to whether the suspension and later restoration of his license triggered the changes in his job position. On this question, Vincek

offered conflicting testimony. At one point he testified that his title at the time of his license suspension was Dispatcher, a position with no driving responsibilities (Vincek Dep. at p. 19 li. 14–25), but at another point he testified that he was driving vehicles for WBMW immediately before the suspension and stopped driving following the suspension. (Vincek Dep. at 20–21).

On May 20, 2003, Calabro filed a charge of pregnancy discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*See* First Amended Complaint at § IV). She requested and received a Notice of Right to Sue letter dated June 25, 2003 from the EEOC. (*See id.*). On July 11, 2003, she filed this action under Title VII and the New York State Human Rights Law.

## *ANALYSIS*

### I. *Summary Judgment Standards*

The court may enter summary judgment only if it concludes that there is no genuine dispute as to any material fact and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68 (2d Cir.2000); *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 485 (2d Cir.1998); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). It is axiomatic that the role of the court on such a motion is to discern whether there are any factual issues to be tried, not to resolve them. *See, e.g., Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994).

The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine is-

sue of material fact. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002). In making this judgment, the court must view the record in the light most favorable to the non-moving party. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Horvath v. Westport Library Ass'n,* 362 F.3d 147, 151 (2d Cir.2004). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. *See, e.g., Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149 (2d Cir.1998). In doing so, the opposing party cannot rest on "mere allegations or denials" of the factual assertions of the movant, *see, e.g., Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), nor can she rely on her pleadings or on unsupported assertions, conjecture, or conclusory factual allegations. *See, e.g., Goenaga,* 51 F.3d at 18. She must also "do more than simply show that there is some metaphysical

doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), by presenting specific evidence in support of her contention that there is a genuine dispute as to one or more of the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Goenaga,* 51 F.3d at 18. If, however, "the party opposing summary judgment propounds a reasonable conflicting interpretation of material disputed fact," summary judgment must be denied. *See, e.g., Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983) (citing *New York State Energy Research & Dev. Auth. v. Nuclear Fuel Serv. Inc.,* 666 F.2d 787, 790 (2d Cir.1981)). *See also Rogath v. Siebenmann,* 129 F.3d 261, 266 (2d Cir.1997).

## II. *The Title VII Pregnancy Claim*

### A. *Legal Criteria*

Defendant challenges Calabro's discriminatory-termination claim, stating that she cannot demonstrate the existence of a genuine issue of material fact under federal law. We first summarize the legal criteria by which plaintiff's Title VII claim must be judged.

Title VII makes it unlawful "for an employer ... to discharge any individual ... because of such individual's [ ] gender." 42 U.S.C. § 2000e—2(a)(1). The Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), a 1978 amendment to Title VII, was enacted to include pregnancy-based discrimination within Title VII's prohibition of gender-based discrimination. *See, e.g., Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 506 n. 3, 119 S.Ct. 2139, 144

L.Ed.2d 450 (1999) (Stevens, J., dissenting) (PDA enacted to overrule *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976)); *Int'l Union, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 198–99, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991); *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 678, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983).[1]

To establish a claim for disparate treatment based on pregnancy, the plaintiff must demonstrate that she was subjected to an adverse employment action, and that her pregnancy was a motivating factor in the action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). The first step in undertaking such a showing involves proof of a *prima facie* case. *See, e.g., Reeves v. Sanderson Plumbing,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Windham v. Time Warner, Inc.,* 275 F.3d 179, 187 (2d Cir.2001). Plaintiff's burden to establish such a case is "minimal." *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (*en banc*). She need only demonstrate that she is a member of a protected class, that she was qualified for her position, that her employer terminated her or subjected her to some other adverse employment action, and that this action took place in circumstances suggesting that it was motivated by plaintiff's membership in the protected class. *See, e.g., Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 91–92 (2d Cir.2001); *James v. New York Racing Assn.,* 233 F.3d 149, 154 (2d Cir.2000) (quoting *Fisher,* 114 F.3d at 1335).

---

**1.** Section 701(k) of the 1964 Civil Rights Act, as amended, states that

The terms "because of sex" or "on the basis of sex" [in Title VII] include but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work....

If the plaintiff makes a *prima facie* showing, the defendant "may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000). If the defendant articulates such a non-discriminatory reason for its actions, the burden-shifting process is at an end, and the plaintiff must demonstrate by a preponderance of the evidence that discriminatory animus was a motivating factor in the employer's adverse action. *See Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Weinstock*, 224 F.3d at 42.

## B. *Assessment of Plaintiff's Title VII Claim*

### 1. *The Prima Facie Case*

Defendant does not dispute that plaintiff satisfies two of the four elements of her *prima facie* burden. Plaintiff, as a pregnant female, was within a protected class. *See* 42 U.S.C. § 2000e-(k). She also suffered an adverse employment action, as she was terminated. Defendant contends, however, that Calabro cannot make the *de minimis prima facie* showing because (1) she lacked one of the qualifications required for her job—a valid driver's license—and (2) since she did not have a valid license, her termination did not take place in circumstances suggesting an inference of discrimination. (*See* Defts' Memo at 4; Deft's Reply at 4–8). We disagree.

### (a) *The "Qualification" Requirement in a Prima Facie Case*

There is no dispute that defendant specified, as part of its job requirements for the Motoring Advisor position, that the Advisor have a valid driver's license. Pointing to Calabro's suspended license, defendant argues that, at the time of plaintiff's discharge, she was unqualified for the job, and hence cannot meet this aspect of her

*prima facie* burden. Defendant does not suggest that Calabro lacked any other qualifications for the job, and it does not suggest that the suspension of the driver's license was not readily correctable.

Plaintiff contends that she was qualified to work as a Motoring Advisor because (1) she satisfied all the job requirements except the *"one* minor qualification" of possessing a valid driver's license and (2) the driver's-license requirement was merely a "paper" requirement and not an indispensable one for the job. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Opp. Memo") at 10–12). Although we do not entirely agree with plaintiff's characterization of the requirement, we do conclude that, for purposes of her *prima facie* case, she sufficiently demonstrates that she was qualified for the position.

■ To prove her qualification for the job, a plaintiff need only "establish basic eligibility for the position at issue," by showing that she "possesses the basic skills necessary for performance of [the] job." *Slattery*, 248 F.3d at 91–92. *See Windham*, 275 F.3d at 187. This articulation comports with the *de minimis* burden on the plaintiff in establishing a *prima facie* case and finds ample support in Second Circuit caselaw, which adheres to the notion that the plaintiff need show only that she was "qualified" for the position. *Compare Slattery*, 248 F.3d at 91–92, *with McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997); *see generally Darboe v. Staples, Inc.*, 243 F.Supp.2d 5, 11–12 (S.D.N.Y.2003).

■ Of particular pertinence, the courts have repeatedly emphasized that the qualification prong must not be interpreted in such a way as to shift onto the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffered neu-

tral reason for an adverse action. *See Powell v. Syracuse Univ.,* 580 F.2d 1150, 1155 (2d Cir.1978); *Taylor v. Local 32E Service Employees Intern., Union,* 286 F.Supp.2d 246, 252–53 (S.D.N.Y.2003); *Darboe,* 243 F.Supp.2d at 11–12. Consistent with this approach, if an otherwise qualified employee is alleged to have engaged in misconduct or otherwise to have created circumstances justifying her termination, that conduct is appropriately evaluated, not in the *prima facie* "qualifications" analysis, but rather in assessing the employer's stated neutral reason for the adverse action and the employee's pretext case. *See, e.g., Gregory v. Daly,* 243 F.3d 687, 696 (2d Cir.2001); *de la Cruz v. New York City Human Resources Admin. Dept. of Social Services* 82 F.3d 16, 20 (2d Cir.1996); *Powell,* 580 F.2d at 1155.

■ Applying these standards, we conclude that the record contains ample evidence that Calabro was qualified for the job. It is uncontested that Calabro possessed all of the basic skills to perform her job, and indeed that defendant consistently rated her job performance as satisfactory in her periodic evaluations. There is also no question that she was capable of driving. As for her suspended license, defendant does not quarrel with plaintiff's representation that she was unaware of its suspension until her termination and that she could have remedied the insurance-payment problem almost immediately. (Opp. Memo at 12). Calabro thus satisfies this prong of the *prima facie* test.

In resisting this conclusion, defendant urges us to take a different approach in assessing plaintiff's qualifications. It admits that plaintiff's performance was satisfactory, but contends that the "[p]laintiff's job performance is not at issue in this case. The present case deals with a basic fundamental skill required for the position which plaintiff no longer possessed at the time of her discharge. The only issue for the Court to determine is whether the driver's license requirement was so basic that plaintiff's failure to have it rendered her unqualified for continued employment." (Deft's Reply at 4).

We cannot adopt this argument, not only because it deviates from the standard approach of the Second Circuit, but also because it is fails to address the concern at which the *prima facie* "qualification" analysis is targeted. If a plaintiff is simply and unequivocally incapable of performing the job that she has been denied or from which she has been terminated, there is no need to pursue a pretext analysis, since there would be no basis to require the employer to hire or retain someone in a position if she cannot perform its functions. The suspended status of plaintiff's driver's license, however, does not fit into that category of "basic skills". Regardless of how the defendant may have categorized the license requirement, the suspension of plaintiff's license was a temporary and potentially easily remediable condition, and thus it cannot be taken as incontrovertible proof that plaintiff could not perform her job.

For purposes of our analysis, we assume that a valid driver's license was indeed a genuine necessity and not merely a "paper requirement" as plaintiff asserts. However, in applying the *McDonnell Douglas* "qualification" prong to this case, the relevant inquiry is not simply whether a driver's license was an indispensable job requirement, but rather what the precise contours of that indispensable job requirement were. Specifically, did it have to be met at all times without any exception, so that any failure, even a temporary and immediately curable one, automatically rendered a Motoring Advisor unqualified for his or her job?

There is enough evidence in the record to permit us to answer this question, at least for *prima facie* purposes, in the negative. At the very least, the record reflects genuine disputes on this material factual question. First, Calabro was promoted to the Motoring Advisor position even though at the time she did not meet another Physical and Work Demand for the position—the requirement that she be able to drive a manual transmission car. (Calabro Dep. at p. 91 li. 17–20; Rubin Aff., Ex. B).[2] This indicates that defendant would accommodate Calabro's temporary failure to meet a Physical and Work Demand when she was not pregnant, apparently in view of her ability to perform her principal duties. (*See* Opp. Memo at 11; Calabro Dep. at 91–92).

Second, and more importantly, a temporary inability of an employee to meet any of the listed "Physical and Work Demands" would not have rendered a Motoring Advisor unqualified for the job. For example, the Advisor must be able to engage in "Walking or standing for extended periods", but a salesperson could hardly be considered "unqualified", within the meaning of *McDonnell Douglas,* if he had a twisted ankle but instead of staying home chose to come to work, while unable to walk or stand for extended periods for several days. Similarly, while the Advisor must be able to engage in "[o]ccasional bending, reaching and light lifting", he could hardly be called unqualified if, for a few days, he had a sore back.[3] These hypotheticals illustrate that defendant's approach, especially with regard to an eas-

ily correctable and temporary circumstance, is not what the *prima facie* qualifications test is concerned with.

It follows, then, that defendant's contention that "[t]he present case deals with a basic fundamental skill required for the position which plaintiff no longer possessed at the time of her discharge", (Deft's Reply at 4), is a mischaracterization of the issue. Plaintiff apparently had the "skill" to drive. If any other pertinent "skill" is involved in the "qualification" analysis, it would be Calabro's ability to obtain reinstatement of her license quickly enough to avoid jeopardizing the successful performance of her job.

Defendant does not dispute on this motion that the suspension was in fact a readily curable problem. Rather, it argues (1) that WBMW was free to assign whatever weight it chose to the driver's license requirement, that is, it was justified in not permitting any exception to the driver's license requirement (Deft's Reply at 1), and (2) that Ms. Abrams never advised senior management that plaintiff could have restored her driver's license quickly. (*id.* at 8). These arguments both are *non sequiturs.*

■ The employer is free to insist upon any non-discriminatory requirements for retention of a job, but for reason already noted, the asserted failure of an employee to meet requirements other than possession of the basic skills of the job is properly assessed when evaluating the employer's stated neutral reason for termination. As noted, the plaintiff need only show that

---

**2.** On plaintiff's own initiative, she later learned to drive a manual transmission vehicle. (Calabro Dep. at p. 92, li. 3–5).

**3.** This, of course, does not mean that the defendant may not terminate such an employee; it only means that the employee is still "qualified" for his job in the realistic and

practical sense of the word. The law does not prohibit dismissal of qualified at-will employees, but it does prohibit dismissals for discriminatory reasons. In this section we are focused on the narrow question of what "qualification" means legally and as applied to the instant case.

she "possesses the basic skills necessary for performance of [the] job", and assertions of disqualifying employee conduct should be evaluated as part of the assessment of the defendant's stated non-discriminatory reason for its decision. *See Gregory*, 243 F.3d at 696; *de la Cruz*, 82 F.3d at 20; *Powell*, 580 F.2d at 1155.[4]

As for defendant's claimed ignorance of the fact that plaintiff could have promptly arranged for the reinstatement of her license, that is entirely irrelevant to the *prima facie* case. Plaintiff need only demonstrate arguable ability to do her job, and the employer's ignorance of her ability to reinstate her license is pertinent only to whether its termination of her was in fact for a nondiscriminatory reason, an issue that we address in the succeeding stages of the *McDonnell Douglas* analysis.

### (b) *Inference of Discrimination*

WBMW further argues that Calabro cannot satisfy the last element of the *prima facie* case, that is, that the circumstances surrounding plaintiff's termination raise an inference of discrimination, since it had a legitimate reason for terminating Calabro. This argument, which turns again on the license question, fails for the same reason as defendant's argument with respect to plaintiff's qualifications.

■ The circumstances of Calabro's dismissal could lead to a reasonable inference that her pregnancy played at least some role in defendant's decision. The evidence in the records would permit a trier of fact to find that plaintiff had performed her job well up to the time that she was terminated; that defendant's CEO and two managers expressed strong and unambiguous unhappiness when they learned that Calabro was pregnant;[5] that they terminated her a few days later; that although they also had learned in the interim that her license had been suspended, they made no effort to determine whether the suspension could be promptly lifted; and that when a male employee whose position required a license suffered the loss of that license for driving while intoxicated, defendant accommodated him by shifting his position rather than firing him. The evidence that would support such findings is plainly ample to meet plaintiff's *prima facie* burden.

### 2. *Plaintiff's Pretext Case*

We turn next to the question of whether defendant has shown a legitimate, nondiscriminatory reason for plaintiff's discharge, and, if so, whether plaintiff can show that defendant's proffered reason is a pretext for pregnancy discrimination.

### (a) *A Neutral Reason*

■ WBMW represents that it terminated Calabro because she had a suspended driver's license. The evidence submitted indicates that WBMW required its Motoring Advisors to maintain valid driver's licenses for several reasons. Motoring Advisors could be called upon to provide vehicle demonstrations, and they could also be required to drive under special circumstances during a customer's test drive. Also, the dealership's ability to se-

---

4. Were defendant's approach adopted, an employer could impose non-discriminatory but immaterial requirements for a job, and if the employee only momentarily failed to meet such a requirement, the employer could terminate her for entirely discriminatory reasons and nonetheless remain immune for such statutorily prohibited conduct.

5. "[A] plaintiff may rely on direct evidence of what the defendant did and said' in satisfying her initial burden under *McDonnell Douglas.*" *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 123 (2d Cir.2004) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir.2001)).

cure dealer plates depended on valid licenses. (Rubin Aff., Ex. B; Abrams Dep. at 25–26). Calabro does not dispute that her license had been suspended prior to her termination.

The burden on the defendant at this stage is minimal. WBMW is required only to articulate, not to prove, "some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "Any stated reason is sufficient; the employer need not persuade the court that the proffered reason was the actual reason for its decision." *Tarshis v. Riese Org.,* 211 F.3d 30, 36 (2d Cir.2000). Given this low threshold, WBMW has carried its burden by pointing to Calabro's license lapse as the reason for her termination.

### (b) *Pretext and Discrimination*

This conclusion triggers the plaintiff's "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "[I]t is not enough for a plaintiff to show that the defendant's legitimate, non-discriminatory reason for its employment reason is pretextual; the plaintiff must also prove by a preponderance of the evidence that defendant's stated reason is 'a pretext for discrimination'." *Fisher v. Vassar College,* 70 F.3d 1420, 1433 (2d Cir.1995) (quoting *St. Mary's,* 509 U.S. at 515, 113 S.Ct. 2742), *aff'd en banc,* 114 F.3d 1332 (2d Cir.1997). This means that Calabro must show that her pregnancy was a motivating factor in her termination. However, she need not show that her pregnancy was the only reason. *See Holtz,* 258 F.3d at 78; *Sutera v. Schering Corp.,* 73 F.3d 13, 17 (2d Cir. 1995). For the purpose of defendant's summary-judgment motion, our task is to determine whether there is a triable dispute about this question.

■ In showing pretext in the final step of the *McDonnell Douglas* analysis, Calabro may carry her burden "by reliance on the evidence comprising the *prima facie* case, without more." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 79 (2d Cir.2001) (citing *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995)). We have concluded in our discussion of the last element of plaintiff's *prima facie* case that Calabro has presented enough evidence to suggest that her discharge occurred in circumstances indicating pregnancy discrimination. We now find that the same evidence suffices to create a triable dispute as to whether the driver's license suspension was a pretext for a termination based at least in part on pregnancy.

■ We start by noting the evidence suggesting that defendant accommodated a male employee who had a suspended driver's license, and that it did so by transferring him from a position requiring a driver's license (a Quality Control position) to a position not requiring one (a Dispatcher) and later transferring him back to the original position. A showing that the employer treated plaintiff "less favorably than a similarly situated employee outside his protected group" is a recognized method of showing pretext. *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000); *see Sorlucco v. New York City Police Dept.,* 971 F.2d 864 (2d Cir.1992); *Stewart v. IBM Corp.,* 867 F.Supp. 238 (S.D.N.Y. 1994). A plaintiff relying on this method "must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham,* 230 F.3d at 39.

Pointing to the same evidence, the parties dispute whether Calabro was similarly situated to this male employee, Mr. Vincek. As we have noted, Vincek's driver's

license was suspended as of May 31, 2001 and the license was restored on September 6, 2001. (Calabro Aff., Ex. B, Vincek 1). The record shows that Vincek was transferred between the Quality Control and the Dispatcher positions four times during his employment with defendant, but does not contain the dates of those transfers. Although, as noted, there is some possible dispute as to whether Vincek's license suspension led to his transfer to Dispatcher, he did testify that he was driving vehicles for WBMW immediately before the suspension and stopped driving upon the suspension. (Vincek Dep. at 20–21).

On this record, a trier of fact could conclude, based on the testimony of Vincek and the timing of his transfer from, and then back to, the Quality Control job, that defendant took steps to retain his services despite his loss of his license. That possibility provides a basis for inferring disparate treatment of plaintiff for reasons other than the suspension of her license.

The balance of the record adds still stronger support to plaintiff's contention that she was terminated because of her pregnancy. Defendant fired Calabro only three days after learning about her pregnancy. Moreover, that step was taken after the CEO and two other managers had expressed considerable unhappiness at plaintiff's expectant status. In addition, defendant had made an accommodation for plaintiff when she was not pregnant, but chose not to do so when she was pregnant. Furthermore, defendant's managers, after learning of her license suspension, made no inquiry into the source of the problem or whether it could be quickly remedied, and chose instead to terminate her immediately despite her entirely satisfactory job performance until then.

Although defendant argues that its decision to terminate Calabro was based solely on the lapse of her driver's license, the record before us does not warrant summary judgment. Summary judgment is appropriate only where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir.1994). Given the evidence proffered by plaintiff, we conclude that she has raised a genuine issue of material fact regarding defendant's motives for dismissing her.

In seeking to avoid this conclusion, defendant contends that plaintiff's license suspension caused "interruption [to] ... its business operation" and "potential liability risks to which WBMW was exposed and would have continued to be[ ] exposed." (Def't's Reply at 1). By "interruption to its business operation," defendant is referring to the denial by the DMV of its application for a dealer plate under plaintiff's name. But the denial did not cause defendant to lose a dealer plate that it had already had. The DMV simply denied defendant a new dealer plate. Calabro became a Motoring Advisor six months earlier, and she successfully functioned in that capacity without a dealer plate under her name.

In any event, these considerations go to the persuasiveness of defendant's contention that its termination decision was not affected in any significant respect by the knowledge that plaintiff was pregnant. That is an issue appropriately left to the trier of fact, since defendant's motivation is plainly in genuine dispute.

Defendant also shows, through affidavits by two of its female employees and the testimony of Ms. Abrams, that three of its

female employees received maternity leave and were then restored to their original or equivalent positions unless they voluntarily decided not to return to work. (*See* Affidavit of Rosaura Sanchez, sworn to October 14, 2004, at ¶¶ 5–8; Affidavit of Corinne Gonzalez, sworn to October 15, 2004, at ¶¶ 3–6; Abrams Dep. at p. 60 li. 20 to p. 62 li. 19). This proffer also goes to the weight of defendant's neutral explanation for its termination decision, but it does not preclude a trier of fact from concluding that plaintiff's firing was influenced by her pregnancy. As the Second Circuit has noted, since "Title VII's principal focus is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of [a protected personal characteristic] simply because it can prove it treated other members of the employee's group favorably." *Graham,* 230 F.3d at 43.

Furthermore, none of the retained pregnant employees was a salesperson, as was Calabro. Rosaura Sanchez was a "receptionist," (Sanchez Aff. at ¶ 4), Corrine Gonzalez was an administrative assistant (Gonzalez Aff. at ¶ 3), and Cristin Flemming was a service advisor. (Abrams Dep. at p. 60 li. 25). This distinction is particularly pertinent. Abrams testified that "management wouldn't feel that [Calabro] could do her job to the fullest capacity" if they found out about her pregnancy, "[b]ecause she's a salesperson and she had to work long hours. If she was an office person or a service person who worked 9 to 5, that's different." (Abrams Dep. at p. 65 li. 3–14; p. 80 li. 6–9). Thus, although defendant's retention of other pregnant employees may bolster its contention that it relied on a non-discriminatory reason for terminating plaintiff, it does not preclude a finding that WBMW was discriminatorily motivated in its treatment of Calabro.

The question before the Court is not whether unlawful discrimination was the sole reason why WBMW terminated plaintiff. Rather, the issue is whether, on the record evidence, a rational trier of fact could find that despite any legitimate grounds it may have had for the termination, unlawful discrimination played a motivating role in its decision. As the Second Circuit has explained:

> To defeat summary judgment within the *McDonnell Douglas* framework, . . . , the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors.

*Holtz,* 258 F.3d at 78 (internal quotations and citations omitted); *see also Sutera v. Schering Corp.,* 73 F.3d 13, 17 (2d Cir. 1995).

In sum, we find that Calabro has met her burden at this final step in the *McDonnell Douglas* to raise triable issues of material fact. The determination as to whether Calabro's pregnancy factored into defendant' decision to terminate her is properly left to a trier of fact, who can determine what weight to accord the competing evidence in the record. *See Gallo,* 22 F.3d at 1224 ("A trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue.") (citations omitted).

### III. *The State Human Rights Law Claim*

■ The New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, provides protections to employees that are comparable in scope to those afforded under Title VII. Substantively, the same standards apply in assessing Title VII and NYSHRL claims. *See*

*Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII"); *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 305, 786 N.Y.S.2d 382, 391, 819 N.E.2d 998 (2004) ("The standards for recovery under the New York State Human Rights Law ... are the same as the federal standards under title VII of the Civil Rights Act of 1964.").

Therefore, just as material issues of fact remain with respect to plaintiff's Title VII claim, so too material issues remain with respect to her Human Rights Law claim. Accordingly, defendant's motion for summary judgment on plaintiff's claim of pregnancy discrimination under the Human Rights Law is denied.

## CONCLUSION

For the reasons stated, we deny defendant's motion for summary judgment.

SO ORDERED.