**Derrick ANDERSON, Plaintiff,**

v.

**HERTZ CORPORATION, Defendant.**

**No. 03 Civ. 9131(SCR).**

United States District Court,
S.D. New York.

July 30, 2007.

Michael H. Sussman, Sussman Law Offices, Goshen, NY, for Plaintiff/Defendant.

Frank B. Shuster, Rosemary C. Lumpkins, Constangy, Brooks & Smith, L.L.C, Atlanta, GA, Kenneth Welch Digia, Epstein, Becker & Green, P.C., New York, NY, for Defendant.

## DECISION AND ORDER

STEPHEN C. ROBINSON, District Judge.

## I.  Background

### A.  Procedural History

Derrick Anderson (the "Plaintiff") filed a Complaint on November 18, 2003 against Hertz Corporation (the "Defendant"), alleging that he was terminated from his job

on the basis of his race in violation of 42 U.S.C. § 1981 and New York State Executive Law § 296. Defendant moved for summary judgment, arguing that Plaintiff failed to demonstrate a prima facie case of discrimination or, alternatively, that Defendant's reasons for terminating Plaintiff were not pretextual.[1] For the reasons discussed below, Defendant's motion for summary judgment is GRANTED.

## B. Facts

Plaintiff, an African–American man, was hired by Defendant in March 2002 to work as a Station Manager at Defendant's Stewart Airport rental car operation. Def. R. 56.1 St. at ¶ 1. As part of his job application, Plaintiff was interviewed by Area Employee Relations Manager Jean Lopez ("Lopez") and Art Holl ("Holl"), the City Manager responsible for oversight of Defendant's Stewart Airport operation. *Id.* at ¶ 2. Lopez and Holl recommended Plaintiff to New York Region Employee Relations Manager Al Regner ("Regner"), who interviewed Plaintiff and made the final decision to hire him. *Id.* at ¶¶ 2–3; Regner Tr. at 11. Holl testified at his deposition that Plaintiff was the only African–American manager employed at Defendant's Stewart Airport location during the 12 years Holl supervised operations there. Holl Tr. at 7, 11. Regner, however, declared that he has hired or promoted at least 20 African–Americans into Station Manager positions at other Hertz locations in the New York Region between 1998 and 2005 alone. Regner Decl. at ¶¶ 2–5.

Plaintiff's job responsibilities included overseeing the rental operation at Stewart Airport, as well as supervising customer service representatives, vehicle service agents, transporters, and lot attendants. Pl. R. 56.1 St. at ¶ 48. On his first day of work, Plaintiff received and reviewed a copy of Defendant's New York Region Rules and Regulations, and understood that the Rules and Regulations applied to him. Def. R. 56.1 St. at ¶¶ 4–5. That document listed "serious breaches for which immediate discharge can be initiated," including "disorderly conduct, fighting, or attempting to fight on employer's property or while on duty." Pl. Dep. Ex. 6 at 3.

During his tenure at Hertz, Plaintiff had various problems with certain employees. For example, Plaintiff testified that one subordinate, Lew Bardwell ("Bardwell"), engaged in "constant harassment" of a racial nature. Pl. Tr. at 249. Specifically, Bardwell allegedly said to Plaintiff that if he "had the will, [he] would burn" the "black people over in Africa ... because they all have AIDS." *Id.* Bardwell also allegedly told Plaintiff that "black people is [sic] no f'ing good. I hate them, I hate them, I hate them." *Id.* Plaintiff testified that he responded to Bardwell by saying "you'll get over that, just relax. Do your work and that's all that counts." *Id.* In addition, Bardwell allegedly called Plaintiff a "black bastard" and a "son of a nigger." *Id.* at 251–52. Plaintiff testified that he "could have fired [Bardwell]," but that he did not because of Bardwell's age and because Bardwell was "a very good worker."

---

**1.** Though Plaintiff's Complaint did not specifically include a cause of action based on a hostile work environment, Defendant's motion contained arguments for why summary judgment would be appropriate on such a claim. Plaintiff's opposition papers make clear, however, that there is no hostile work environment claim here. See Pl. Mem. of Law at 24 ("[a]s plaintiff's complaint presents only a cause of action for termination, we do not address the arguments defendant has submitted on "racially hostile" work environment"). Given Plaintiff's position, there is no need for this Court to address any purported claim for discrimination based on a hostile work environment.

*Id.* at 173. Another subordinate employee, Mark Cimmino ("Cimmino"), testified that he heard Bardwell refer to Plaintiff using racial slurs outside of Plaintiff's presence on two or three occasions, and generally heard Bardwell use racial slurs "many times." Cimmino Tr. at 11–12, 42. Plaintiff reported Bardwell's conduct to Holl, but no action was taken against Bardwell. Pl. Tr. at 263–64, 270–72. According to Plaintiff, Holl told him "we live as a team, Derrick. We have to have-we're a family here, you know, we have to live together," and that Plaintiff should report any problems to Holl and nobody else. *Id.* at 253–54. Holl denied that Plaintiff ever informed him of Bardwell's racial remarks. Holl Tr. at 28.

Plaintiff also documented a variety of issues regarding an employee named Janet Fekete, who, according to Plaintiff, "would always find a racial joke and throw it at me," and once greeted Plaintiff by saying "Hi Blackie." Pl. Dep. Ex. 15. Fekete also allegedly made comments about Plaintiff's Jamaican heritage. Pl. Dep. Ex. 16. In addition, Plaintiff reported that Cimmino once told him "I would not be pushing us because some people around here and up top is [sic] not happy to know you got the job and did you know that there is [sic] some people up at the office don't like you because you're a black man and no black managers is [sic] around here." *Id.* According to Plaintiff, he complained to Holl about the incidents with Fekete in November 2002. Pl. Tr. at 223–24. Holl admitted that he spoke with Plaintiff about Fekete's performance around that time, but denied that Plaintiff ever raised any concerns of race harassment or discrimination during that discussion. Holl Tr. at 24–26. Plaintiff subsequently met with Fekete; he claimed that her behavior did not change following the meeting, but did not cite any

further examples of racially motivated conduct by Fekete that took place after their meeting. Def. R. 56.1 St. at ¶ 35. Holl never took any action against Fekete.

Holl was satisfied with Plaintiff's performance up until January 11, 2003. Holl Tr. at 28–29. That day, Plaintiff was present at Defendant's Stewart Airport location with three subordinates—Bardwell, Cimmino, and a woman named Joanne or Anna (last name unknown, hereinafter "Joanne"), all of whom are Caucasian—who worked for Defendant as transporters. Def. R. 56.1 St. at ¶ 7; Pl. Dep. Ex. 9 at 1. During the course of the day, Plaintiff and these employees had an ongoing dispute stemming from Plaintiff's willingness to allow transporters from Defendant's Port Newark facility to take a "turnback" vehicle—an automobile that has reached the end of its rental life—from the Newburgh area back to Port Newark. PL Dep. Ex. 9. Plaintiff instructed Bardwell, Cimmino and Joanne to perform certain tasks to assist the Port Newark transporters, but at various times, each of the three employees refused to carry out Plaintiff's instructions. *Id.* at 4. In sum, Bardwell, Cimmino, and Joanne were upset that Plaintiff was allowing the Port Newark transporters to move the turnback vehicle because the movement of turnbacks is a lucrative assignment for a transporter. *Id.* at 6; Def. R. 56.1 St. at ¶ 13; Holl Decl. Ex. B (second written statement of Bardwell).

According to Plaintiff's statement recounting the events of January 11, when Bardwell returned to Defendant's Stewart Airport site, he yelled at Plaintiff in Plaintiff's office and directed a stream of profanity towards him; Plaintiff never alleged in his statement that Bardwell made any comments at that time about Plaintiff's

race.[2]  Pl. Dep. Ex. 9 at 7–8.  Plaintiff reported that Bardwell's verbal outburst then turned violent, as Bardwell punched him in his left eye and forehead;  Plaintiff's response was to guard his face with his hands as Bardwell continued to strike him. *Id.* at 8. Plaintiff later admitted that he did punch Bardwell.  Pl. R. 56.1 St. at ¶ 110.

Bardwell's written account of the events of January 11 confirmed that the underlying cause of the incident was a dispute about the turnback vehicle, and confirmed that he called Plaintiff an "idiot" and an "asshole"[3];  according to Bardwell, however, Plaintiff made the first physical attack by striking Bardwell in the right ear, to which Bardwell responded by punching Plaintiff in the eye.  Holl Decl. Exs. A, B. Cimmino also confirmed that the turnback issue was the subject of the altercation, and reported that around 7:15 p.m., he observed Bardwell "yelling obscenities at [Plaintiff]" including some of the same phrases mentioned in Plaintiff's account. Cimmino Dep. Ex. 2. According to Cimmino, "[Bardwell] initiated everything" and was "raving like a lunatic."  Cimmino Tr. at 91, 21.  Cimmino reported after Bardwell left Plaintiff's office, Plaintiff followed Bardwell toward the counter area and walked towards Bardwell.  Cimmino Dep. Ex. 2. The physical fight started shortly thereafter, with Bardwell pushing Plaintiff and Plaintiff pushing back;  eventually, Bardwell threw the first punch, striking Plaintiff in the head.  *Id.* Plaintiff then punched Bardwell in the head, and Bard-

well landed at least one more punch before they were separated.  *Id.* When Holl arrived at the scene, he observed that Plaintiff had a swollen mark above his left eye and that Bardwell's ear appeared to be swollen and very red.  Holl Tr. at 37–38; 56.  Plaintiff and Bardwell were both suspended pending further investigation. Def. R. 56.1 St. at ¶ 12.

Regner interviewed Plaintiff, Cimmino, and Bardwell regarding the incident.  *Id.* at ¶ 17.  Regner testified that after his investigation, he concluded that Plaintiff had been involved in a fight and had not taken sufficient steps to avoid or diffuse the situation.  Regner Tr. at 43.  Holl testified that "managers have the responsibility to quell ... fellow employee acts like this," Holl Tr. at 63, and declared that he was unaware of any manager under his supervision ever becoming involved in a fight at work.  Def. R. 56.1 St. at ¶ 20. Indeed, Holl was only aware of two incidents involving disorderly conduct, fighting, or attempting to fight on Hertz property during his tenure as City Manager. *Id.* at ¶ 21.  In both situations, each of which involved one Caucasian and one African–American employee, there were no witnesses to the event and no other basis for determining what transpired;  none of the four participants in those incidents were disciplined by Holl. *Id.* at ¶¶ 22–23. In consultation with Holl, Area Manager Scott Davis ("Davis"), and Region Vice President Dave Schulte, Regner decided to

---

**2.**  Plaintiff's written account of the events of January 11, 2003 was prepared and sent to Holl and Regner on January 13, 2003, and contained vivid detail concerning Bardwell's language that evening.  Pl. Dep. Ex, 9. At his July 13, 2004 deposition, Plaintiff testified that Bardwell said to him during the course of their argument "nigger, you don't know what you're doing."  Pl. Tr. at 172–73.  This remark is not mentioned in Plaintiff's written summary.

**3.**  Plaintiff's written statement alleged that Bardwell used numerous additional vulgarities to refer to him and to managers at Port Newark;  Bardwell's written statements neither confirm nor deny the other language Plaintiff claimed was used by Bardwell that night. *See* Pl. Dep. Ex. 9 at 7–8;  Holl Decl. Exs. A, B.

terminate the employment of both Plaintiff and Bardwell, and notified Plaintiff of his termination on January 21, 2003. Def. R. 56.1 St. at ¶ 18; Holl Tr. at 64. Plaintiff was replaced at Defendant's Stewart Airport facility by Frank Torrell, a Caucasian male. Holl Tr. at 9.

## II. Analysis

### A. Standard of review

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The burden of demonstrating that no material fact exists lies with the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

■ A court considering a motion for summary judgment must construe the evidence in the light most favorable to the non-moving party, drawing all inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.2003). Rather than asking if "the evidence unmistakably favors one side or the other," a court must ask whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If so, the court may not grant a defendant's motion for sum-

mary judgment. Assessing the credibility of witnesses and choosing between conflicting versions of events are roles for the factfinder, not for the court on summary judgment. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996).

■ The non-moving party, however, must present sufficient evidence such that a jury could reasonably find in its favor— "the mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. "The non-moving party may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998).

### B. Claim for racial discrimination under 42 U.S.C. § 1981 and N.Y. Exec. Law § 296

■ 42 U.S.C. § 1981(a) provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." The phrase "make and enforce contracts" is defined in 42 U.S.C. § 1981(b) to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Accordingly, it is now well established that an employee may sue his employer under 42 U.S.C. § 1981 for racially discriminatory termination. *See Lauture v. Int'l Bus. Mach. Corp.*, 216 F.3d 258, 260 (2d Cir.2000). Although it was initially established for Title VII claims, the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to claims arising under § 1981. *See Hudson v. Int'l Bus. Mach. Corp.*, 620 F.2d 351, 354 (2d Cir. 1980).

■ The New York State Human Rights Law prohibits discrimination in employment by making it unlawful "for an employer ... because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual ... to discharge from employment such individual...." N.Y. Exec. L. § 296(1)(a). Claims arising under § 296 are also decided under the same burden-shifting framework that applies to federal actions under § 1981 and Title VII. *See Ferrante v. Am. Lung Assoc.*, 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997).

■ Under the applicable burden-shifting formula, the plaintiff bears the minimal initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *See Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001). A plaintiff who is able to make out a prima facie case creates a presumption of discrimination and shifts the burden of production to the defendant. The defendant must meet this burden by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *See Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir.2001).

■ If the defendant can present a non-discriminatory explanation, the presumption of discrimination drops out of the analysis and the plaintiff must then prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d

105 (2000). To defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir.2004). A plaintiff may satisfy his or her burden at the pretext stage by showing that similarly situated employees outside the protected class received more favorable treatment than the plaintiff did. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000).

■ To establish a prima facie case of employment discrimination on the basis of race, a plaintiff must show that "he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Id.* at 38. Only the fourth element of this test is in dispute here. Among the circumstances that may give rise to an inference of racial discrimination are the employer's criticism of the plaintiff's performance in ethnically degrading terms, the employer's invidious comments about others in the employee's protected group, an employer's more favorable treatment of employees outside of the protected group, or the sequence or timing of events leading to the plaintiff's discharge. *See Ralkin v. New York City Transit Auth.*, 62 F.Supp.2d 989, 996 (E.D.N.Y.1999) (internal citations omitted).

### i. Prima facie case of discrimination

■ To support his claim for discriminatory termination, Plaintiff points to: (a) the fact that he was subjected to derogatory racial remarks by several subordinates, and that senior management did not disci-

pline those subordinates for their behavior; (b) the fact that Bardwell instigated the verbal and physical altercation on January 11, 2003 that led to Plaintiff's termination; (c) the fact that he was the only African-American manager hired at Defendant's Stewart Airport facility in Holl's 12 years overseeing that operation; and (d) the fact that he was replaced by a Caucasian man. Even drawing all inferences in favor of Plaintiff, however, none of these arguments is sufficient to make out a prima facie case that his termination came as a result of racial discrimination.

### a. Remarks by subordinates and inaction by Holl

As to Plaintiff's first argument, various courts within this district have held that verbal comments made by individuals not involved in making the adverse employment decision cannot themselves give rise to an inference of racial discrimination. *See, e.g., Yarde v. Good Samaritan Hosp.,* 360 F.Supp.2d 552, 560 (S.D.N.Y.2005); *Minton v. Lenox Hill Hosp.,* 160 F.Supp.2d 687, 695 (S.D.N.Y. 2001). Plaintiff provides some evidence here that Bardwell, Fekete, and Cimmino made certain racial remarks to Plaintiff during the term of his employment, but there is no question that these three individuals—who were all Plaintiff's subordinates—were not involved in the decision to terminate Plaintiff's employment. Plaintiff offers no evidence of racial remarks by Holl or Regner, the two managers most directly involved in the hiring and firing of the Plaintiff.

According to Plaintiff, we should infer a discriminatory motive on the part of Defendant because Holl failed to take disciplinary action against Bardwell or Fekete after Plaintiff complained to him about their behavior. Yet as a Station Manager, Plaintiff himself was in a position to mete out discipline to his subordinate employees, and opted not to do so—Plaintiff even admitted at his deposition that he could have fired Bardwell for his racially-motivated remarks, but decided not to for various reasons. As for Fekete, Plaintiff provided no evidence to suggest that she continued to make racially inappropriate comments to him after he met with her to confront her about these issues. Plaintiff has pointed this Court to no case that suggests that it would be appropriate to infer that Holl acted with discriminatory animus for failing to discipline employees whom Plaintiff himself refused to discipline. *See Minton v. Lenox Hill Hosp.,* 160 F.Supp.2d 687, 695 (S.D.N.Y.2001) (plaintiff who was in a position to reprimand subordinate employees for their comments could not contend that the racial animus of those employees played a role in his dismissal). While Plaintiff clearly believed that Holl should have taken assertive action against Bardwell or Fekete, it is far too much of a stretch to take Holl's nonaction and understand it to mean Defendant's decision to terminate Plaintiff's employment was based on racial discrimination; indeed, no rational finder of fact could draw such a conclusion.

### b. Bardwell's role in the January 11 altercation

Though Plaintiff has put forward evidence that indicated Bardwell was responsible for instigating the January 11, 2003 altercation, such facts still do not give rise to an inference that Plaintiff's termination was based on racial discrimination. Plaintiff conceded that he punched Bardwell during their scuffle; though Plaintiff argued that his participation in the fight was only as a matter of self-defense, that explanation does not change the reality that there is no dispute that Plaintiff engaged in a fight with his subordinate on January

11, in clear contravention of Defendant's Rules and Regulations.

Defendant conducted an investigation of the incident, and determined that Plaintiff had been involved in a fight; regardless of Holl's or Regner's conclusion as to who started the fight, the investigation revealed that Plaintiff had been involved in a fight, and that served as the basis for his, as well as for Bardwell's, termination. Had Plaintiff shown that Bardwell instigated the altercation but Defendant only fired Plaintiff for his role in the fight, Plaintiff would have demonstrated at least a prima facie case of racial discrimination. That, however, is not the case; both participants in the fight were terminated, and the fact that Defendant declined to give lenient treatment to Plaintiff, the managerial employee, because he may not have been at fault for *starting* the fight, does not give rise to an inference of discrimination solely because Plaintiff is African–American.

### c. Lack of African–American managers at Stewart Airport

█ The fact that Plaintiff was the only African–American Station Manager at Defendant's Stewart Airport location in Holl's 12 years of supervising that particular site does not supply evidence sufficient for Plaintiff to establish a prima facie case of discrimination. Other courts in this district have held that "a racial imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate discrimination." *Branch v. Sony Music Entertainment Inc.*, No. 97 Civ. 9238, 2001 WL 228108, at *6, 2001 U.S. Dist. LEXIS 2320, *15–16 (S.D.N.Y. Mar. 8, 2001). Further, the Supreme Court has held that it would be "unrealistic to suppose that employers can eliminate, or discover and explain, the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 992, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

Here, the fact that Plaintiff was hired to manage Defendant's Stewart Airport site just ten months before the January 11, 2003 altercation that led to his termination belies the inference of discrimination that Plaintiff would have this Court draw based on this purported statistical information. Without considerably more analysis and interpretation of why and how it came to be that Plaintiff was the only African–American manager at Defendant's Stewart Airport operation during Holl's tenure, that fact in isolation is of limited value to the Court.[4] No rational finder of fact could use this piece of information alone to infer that Plaintiff's termination was based on impermissible racial animus.

### d. "Same actor" inference

█ Defendant's argument in support of summary judgment is also bolstered by the fact that Regner made the decision to terminate Plaintiff's employment less than one year after hiring him to be Defendant's Stewart Airport Station Manager.[5] The Second Circuit has held that certain

---

**4.** Plaintiff's assertion of fact here is also so narrow as to be of limited utility; for example, Plaintiff did not consider the fact that a number of African–Americans were hired as managers in the New York region under Regner's supervision.

**5.** Plaintiff attempted to demonstrate in his opposition papers that an individual other than Regner was the actual decision-maker in the hiring of Plaintiff, but did not point to any evidence in the record in support of this contention. Instead, Plaintiff cited a passage from Holl's deposition testimony in which Holl stated, in connection with the search process *for Plaintiff's successor,* that Davis "normally ... will interview also." Holl Tr. at 10. This is certainly not sufficient to counter Defendant's assertion that Regner made the decision to hire Plaintiff.

circumstances surrounding termination decisions "strongly suggest that invidious discrimination was unlikely," including "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997); *see Portee v. Deutsche Bank*, No. 03 Civ. 9380(PKC), 2006 WL 559448, *11, 2006 U.S. Dist. LEXIS 9153, *33 (S.D.N.Y. Mar. 8, 2006) (applying *Grady* in the context of a § 1981 claim). Though only nine days passed between plaintiff's hiring and firing in *Grady*, the Second Circuit has also applied the "same actor" rationale where three years passed between plaintiff's hiring and firing. *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir.2000). Given that Regner hired Plaintiff in March 2002 and fired him just over ten months later, the "same actor" inference clearly applies here to further cast doubt on any potential inference of invidious discrimination in Plaintiff's termination.

### ii. Nondiscriminatory basis for termination

■ Even if this Court were to interpret Plaintiff's arguments as sufficient to meet his prima facie burden, Defendant has demonstrated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. To avoid summary judgment on the question of whether a defendant's purported reason for termination was pretextual, a plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1225 (2d Cir.1994). Plaintiff has failed to do so here.

■ Defendant's New York Region Rules and Regulations made clear that "fighting, or attempting to fight on employer's property or while on duty" was the sort of serious breach of conduct that could lead to immediate discharge. Though Bardwell instigated the verbal and physical altercation on January 11, 2003, Plaintiff admitted that he participated in it, and even if his participation could be construed as self-defense, there is no dispute that Plaintiff's activities were of the sort specifically proscribed by Defendant's Rules and Regulations. Plaintiff cannot maintain that Defendant had no basis to believe that its reason for terminating Plaintiff's employment was false—the basis for termination was fighting, and Plaintiff himself admitted to being part of the fight.

Plaintiff's data regarding the lack of African–American managers at Defendant's Stewart Airport operation, as presented, is insufficient to rebut Defendant's legitimate nondiscriminatory explanation for his termination. The Supreme Court has set specific limitations on how statistical information may be used to support a claim of pretext; a plaintiff must identify a specific employment practice and then provide evidence "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 977, 108 S.Ct. 2777. Here, Plaintiff has done no more than claim that he was the only African–American manager hired at Defendant's Stewart Airport site—he has not identified any specific employment practice that led to this result, and has

provided no analysis of the number of managers hired, the number of African–American candidates interviewed, or any other factors to suggest racial discrimination. The mere fact of the paucity of African–American managers at Defendant's Stewart Airport facility does not come close to rebutting Defendant's explanation for Plaintiff's discharge.

Further, Plaintiff has offered no evidence to suggest that similarly situated employees were treated differently than Plaintiff. According to Holl's unrebutted testimony, no manager under his supervision has ever been involved in a physical altercation of the sort at issue here; it therefore cannot be said that other similarly situated managers of different races have been treated differently for engaging in the type of behavior that led to Plaintiff's termination.

In sum, Regner and Holl identified the fighting as the basis of Plaintiff s termination, and Plaintiff has offered no persuasive evidence to suggest that such explanation was a pretext for a discriminatory motivation. *See Fisher v. Vassar College,* 114 F.3d 1332, 1337, 1342, 1346 (2d Cir. 1997) (holding that if the plaintiff's evidence barely sufficed to establish a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale).

## III. Conclusion

For the reasons discussed above, Defendant's motion for summary judgment is GRANTED. The Clerk of the Court is hereby directed to close this case.

IT IS SO ORDERED.